**UNITED STATES of America**

v.

**Salvatore MERLINO.**

No. Civ. 97–2832.
Crim. No. 88–00003–03.

United States District Court,
E.D. Pennsylvania.

Sept. 17, 1997.

David E. Fritchey, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Joseph M. Marrone, Jr., Philadelphia, PA, for Merlino.

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

On November 19, 1988, Salvatore Merlino was convicted by a jury in a major mafia trial of RICO and RICO Conspiracy in violation of 18 U.S.C. §§ 1962(c) & (d), Illegal Gambling Business, in violation of 18 U.S.C. § 1955, and two counts of Distribution of Methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). The jury specifically found him guilty of 27 RICO predicate acts. These acts included four murders, three attempted murders, six murder conspiracies, one gambling offense, two illegal debt schemes, two distributions of methamphetamine and 14 extortions.[1] Post verdict motions were denied, *United States v. Scarfo*, 711 F.Supp. 1315 (E.D.Pa.1989), and this court sentenced Mr. Merlino to 45 years imprisonment on May 10, 1989.

Petitioner's sentence consisted of a 20 year term for RICO, a 20 year term for RICO Conspiracy, and a 5 year term for the Illegal Gambling Business. These sentences were all consecutive to each other. We also sentenced Mr. Merlino to five years imprisonment for each methamphetamine offense. The first methamphetamine sentence was consecutive to Count One and concurrent with Count Two. The second methamphetamine sentence was consecutive to the first and concurrent with Count Two. All of these federal sentences were consecutive to a life sentence imposed by the Philadelphia County Court of Common Pleas for the first-degree murder of Frankie "Flowers" D'Alfonso.

The Court of Appeals affirmed Mr. Merlino's federal convictions and the Supreme Court denied certiorari. *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990), *cert. denied*, 500 U.S. 916, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). The state murder conviction, however, was subsequently reversed by the Pennsylvania Superior Court, *Commonwealth v. Scarfo*, 416 Pa.Super. 329, 611 A.2d 242 (1992). Mr. Merlino was retried on this charge in early 1997 and was acquitted.

On April 23, 1997, one day before the new statute of limitations period expired pursuant to the Anti–Terrorism and Effective Death Penalty Act of 1996, Mr. Merlino filed the instant motion for relief under 28 U.S.C. § 2255. Petitioner makes six claims: (1) that his pre-sentence report must be amended to reflect Petitioner's subsequent acquittal of the murder of Frankie D'Alfonso; (2) that his sentence was based upon his conviction in the D'Alfonso state murder case in which he was later given a new trial and acquitted; (3) that his consecutive sentences for RICO and RICO Conspiracy violate the Fifth Amendment's prohibition against double jeopardy; (4) that he was denied due process by the size of his trial and the large number of codefendants; (5) that his attorney, Mr. Edwin Jacobs, provided ineffective assistance of counsel; and (6) that his conviction should be vacated because Mr. Scarfo's attorney, Mr. Simone, had been engaged in illegal activities that the government never disclosed to Mr. Merlino.[2] The Petitioner also asks that we

---

1. There are more than 18 acts listed because some of the predicate acts had two parts.

2. Petitioner's motion, filed on his behalf by Mr. Joseph M. Marrone, Jr. of Philadelphia, is a confusing hodgepodge of arguments that we had trouble making head or tails out of initially. We asked Mr. Marrone to clarify his motion by filing the standard § 2255 form, as required by Civil Rule 9.3, to no avail. While the Summary of Argument section of Mr. Marrone's original motion presents the six aforementioned claims, the standard § 2255 form filed by Mr. Marrone lists only two grounds for relief: both of them ineffective assistance of counsel claims. Furthermore, the actual Argument section of Mr. Marrone's brief completely ignores the double jeopardy and due process claims that he asserted in the Summary of Argument section. Indeed, it appears that Mr. Marrone has submitted a draft copy of his brief to this court. For example, Mr. Marrone introduces his fourth argument by stating:

"The cumulative effect of petitioner having been coerced into a joint defense, with Simone virtually dictating every step, by the **(fix this sentence)** [sic] coercion of Scarfo, who put out a murder contract on defendant and his family resulted in petitioner **loosing** [sic] his Sixth Amendment right to effective counsel and foregoing several important other rights." *Motion for a Writ of Habeas Corpus, a New Trial, an Order to Vacate Sentence, Correction of Pre–Sentence Report, an Order to Compel the Production of a Copy of the Petitioner's Pre–Sentence Report, an Evidentiary Hearing, and an Order Authorizing the Petitioner to Join in Similar Motions Filed by Co–Defendants ("Motion")* at 19 (emphasis added). While the term "(fix this sentence)" can have a number of different meanings, we choose to assume Mr. Marrone is referring to the sentence in his brief.

As we have already given Mr. Marrone two chances to file a coherent Habeas Corpus petition, we will not give him a third. Instead we

allow him to join any § 2255 motions filed by his co-defendants. As the facts of this case have been much discussed by this court previously, *see Scarfo,* 711 F.Supp. 1315, we will not repeat ourselves.[3]

## II. DISCUSSION

### A. *Amendment of Pre–Sentence Report*

Petitioner asks this court to amend his pre-sentence report to reflect the fact that he has been acquitted in state court of the murder of Francis D'Alfonso. The government has not objected to this request from Mr. Merlino's co-defendants. *See Government's Response to Phillip Narducci's 28 U.S.C. § 2255 Motion* at 13–14. Accordingly, we will issue an order amending the pre-sentence report to remove the state murder conviction and ordering that Mr. Merlino be furnished with a copy of the report.

### B. *Sentencing*

■ Mr. Merlino next argues that he is entitled to resentencing because "[i]t is . . . clear that this Court considered petitioner's conviction for the murder of Francis D'Alfonso when it imposed sentence," a murder for which he was later acquitted. *Motion* at 8. Mr. Merlino apparently believes that, because his federal sentence was given consecutive to his state sentence in the D'Alfonso case, we were influenced in sentencing by that state conviction. Now that Mr. Merlino has been given a new trial and has been acquitted in the D'Alfonso case, he argues that we must resentence him without reference to the state matter. We do not agree.

At Mr. Merlino's sentencing, we offered both Mr. Merlino and his trial attorney, Mr. Edwin Jacobs, an opportunity to speak to the court concerning sentencing. They refused:

MR. JACOBS: Your Honor, I'll keep it very short, very simple. My client and I are aware of all the previous sentences

imposed by this Court on all the circumstances. My client does not wish to exercise his right of elocution, nor do I have any further statement on his behalf. THE COURT: Thank you, sir. All right. I'll just ask you on the record, you don't care to say anything, is that correct, sir?

MR. MERLINO: Yes, sir.

Tr. 5/10/89 at 4.

We then heard from the government on sentencing. During the government's argument, they asked that the pre-sentence report be amended to include the state court conviction for the murder of Frankie D'Alfonso. Mr. Merlino's counsel did not object to this motion and we amended the pre-sentence report. Tr. 5/10/89 at 6–7. After careful consideration, we imposed our sentence:

THE COURT: All right. This Court is ... prepared to impose sentence. The defendant will rise, and his counsel. I've given individual consideration to the defendant. I've taken into account the trial evidence, the defendant's age, the presentence report, statements made today, the history, character and condition of the defendant. I believe the number of racketeering acts speaks for itself. He also had a high position of leadership in the mob; that he was a former underboss.

Accordingly, the Court feels that the following sentence is appropriate. The defendant is hereby committed to the custody of the Attorney General of the United States of America, or his authorized representative, for imprisonment for a term of 45 years, on condition that the defendant be confined in a jail-type institution. This sentence is composed of a sentence of 20 years on Count One, followed by a sentence of 20 years on Count Two, followed by a sentence of five years on Count Four. They are all consecutive to each other.

---

will muddle through the two documents previously filed, doing our best to touch upon every issue raised, so as not to punish Mr. Merlino for his attorney's sloppiness. We do note, however, that while Mr. Marrone's § 2255 motion should definitely be an embarrassment to the attorney, Mr. Marrone's representation of Mr. Merlino in the Petitioner's collateral attack of his conviction has not constituted ineffective assistance of counsel.

**3.** Although we ordered the government to file an answer on April 25, 1997, and extended the time to do so on June 6, 1997, upon further review we believe that we can deal with the issues raised in this motion without a formal response from the government. We are also aware that the government has had to respond to a large number of these motions as of late.

The Court imposes sentences of five years each on redacted Count Six, that would be superseding Count Ten, and on redacted Count Seven, that would be superseding Count Eleven. Count Six shall be consecutive to Count One and concurrent with Count Two, and Count Seven shall be consecutive to Count Six and concurrent to Count Two.

Upon release, the defendant shall serve a special parole term of ten years. I'm required to impose a special parole term, and I do. The Court imposes no fine, but does impose a $250 special assessment required by law. The Court recommends an institutional security level of five or more. These sentences will be consecutive with the defendant's State sentence; that is, they shall be in addition to that sentence. Now, sir, this is—are there any additions or corrections to this sentence? It's a total of 45 years. All right.

Tr. 5/10/89 at 7–8.

The only manner in which the D'Alfonso case impacted our sentence is that we imposed our sentence consecutive to, and not concurrent with, the state sentence. The sentence itself was not influenced by this prior state conviction. *Cf. United States v. Lyons,* 706 F.2d 321, 335 n. 25 (D.C.Cir.1983) (resentencing only necessary where it cannot be ascertained whether the district court's sentence was influenced by a conviction that was later overturned).[4] As we stated at sentencing, Mr. Merlino was convicted of RICO, RICO Conspiracy, Illegal Gambling Business, and Distribution of Methamphetamine, with 27 underlying Racketeering Acts, including four murders, three attempted murders, and six murder conspiracies. Mr. Merlino served as the underboss of the Philadelphia Mafia, second only to Scarfo. And, when Scarfo was imprisoned in a Texas federal prison between August of 1982 and January of 1984, Mr. Merlino acted as the functional boss of the Scarfo crime family. These facts alone justify the maximum penalty as set out by Congress, without any reliance on

the state conviction. Yet, we did not even levy the harshest sentence that was within our power; we could have sentenced Mr. Merlino to 55 years imprisonment, but we allowed him to serve his methamphetamine sentences concurrent to his RICO sentence, thus trimming 10 years off the maximum amount of time he could have had to spend in prison. The fact that the state sentence has been vacated due to acquittal on re-trial does not impact and cause us to change the actual sentence we imposed. It only impacts when he will begin serving it. Resentencing is therefore not required. *See United States v. Scarfo,* 970 F.Supp. 426, 429, 430 (E.D.Pa. 1997).

### C. Double Jeopardy

 Mr. Merlino stated in the Summary of Argument section of his brief that the imposition of consecutive sentences for RICO and RICO Conspiracy violates the double jeopardy clause of the Fifth Amendment. He never, however, set forth a legal argument supporting his blanket assertion. This claim is therefore dismissed as not being properly raised.

This complaint, even had it been raised properly, would fail. We assume, considering the fact that the majority of Mr. Marrone's brief appears to have been copied directly from the Narducci brothers' Habeas Corpus motions which did actually argue this claim, that Mr. Merlino's complaint stems from the recent Supreme Court decision of *Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996). In *Rutledge,* the Supreme Court held that conspiracy to distribute controlled substances (21 U.S.C. § 846) is a lesser included offense of the continuing criminal enterprise offense ("CCE") (21 U.S.C. § 848) and thus convictions of both cannot amount to consecutive sentences. Armed with *Rutledge,* Mr. Merlino might demand that we reconsider the Court of Appeals' decision in *Pungitore,* 910

---

4. At one point during the sentencing hearing we told Mr. Merlino that "it is [our] policy to consider only pending convictions.... Other matters, we have something listed as pending, an acquittal, and I don't consider things like that, I only consider true convictions with regard to the prior record." Tr. 5/10/89 at 4. We made this statement to assure Mr. Merlino that we would never consider a mere arrest or an acquittal for the purpose of sentencing. We did not mean to imply, however, that we would sentence Mr. Merlino based on his prior convictions. Indeed, Mr. Merlino's sentence was merited only by federal crimes for which he was convicted.

F.2d at 1115–17, that the imposition of consecutive sentences for RICO and RICO Conspiracy does not violate the Fifth Amendment. We disagree. ·

■ The question of whether the double jeopardy clause of the Fifth Amendment prohibits consecutive sentencing for RICO Conspiracy and substantive offenses (18 U.S.C. §§ 1962(c) & (d)) has already been litigated and decided on Mr. Merlino's direct appeal. "Once a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district court to decline to reconsider those arguments if raised again in collateral proceedings under 28 U.S.C. § 2255." *United States v. Orejuela,* 639 F.2d 1055, 1057 (3d Cir.1981) (*citing Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969)); *see also Reed v. Farley,* 512 U.S. 339, 358, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (J. Scalia, concurring) ("claims will ordinarily not be entertained under § 2255 that have already been rejected on direct review."). There is a great interest in the finality of litigation; matters fully addressed and decided on direct appeal should not be reexamined lightly.

In Mr. Merlino's direct appeal, the Court of Appeals discussed the issue of consecutive sentences for RICO and RICO Conspiracy in detail. Specifically, they addressed the question in light of another Supreme Court decision, *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), and held that the vast differences between § 1962 and §§ 846, 848 merited the conclusion that while consecutive sentences were not valid for the latter, they were for the former. Citing *United States v. Marrone,* 746 F.2d 957 (3d Cir.1984), which in turn cited *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the court further held that the statutory provisions in §§ 1962(c) & (d) defined different offenses under the law, and as such cumulative punishment was presumptively valid. The court found no legislative intent to prevent consecutive sentencing, nor did they find anything within the CCE statute, or the cases which interpret it, that required otherwise. *Pungitore,* 910 F.2d at 1115–1116. Given the depth

of the Third Circuit's discussion, we see no need to revisit the issue.

We find, however, that even if we were to reconsider the Court of Appeals' decision pursuant to *Rutledge,* there is nothing in that opinion which would give us pause. Contrary to what we assume would be Mr. Merlino's interpretation, the Supreme Court case is in line with the Third Circuit's assessment of §§ 846 and 848. The *Rutledge* court followed the logic in *Jeffers,* and, using the "same offense" test, held that consecutive sentences could not be imposed for CCE and CCE conspiracy because they are the same offense. The Supreme Court made no comparison or connection between the CCE and RICO statutes. In fact, it noted that its holding was not contrary to the holding in *Garrett v. United States,* 471 U.S. 773, 794–95, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) that conspiracy and the substantive crime that is the object of the conspiracy are distinct offenses. *Rutledge,* 517 U.S. at 300, 116 S.Ct. at 1247. As such, nothing in *Rutledge* undermines the ruling in *Pungitore* that RICO and RICO Conspiracy are separate offenses because of the different elements of proof required; indeed, the rationale and holding of the cases are materially identical. We therefore would have declined to reevaluate the measured opinion of the Court of Appeals, even if Mr. Marrone's brief had argued the issue properly. *See Scarfo,* 970 F.Supp. at 429–30.

*D. Due Process*

■ The Summary of the Argument section of Mr. Merlino's brief also asserts that "[b]ecause of the size [of his trial] and the number of defendants, the petitioners [sic] were denied due process." *Motion* at 5. Again, Mr. Marrone did not set forth any legal or factual reasons supporting this claim. It is therefore denied as being improperly raised.

However, had Mr. Merlino raised this issue properly, it still would have been denied as being procedurally barred. Mr. Merlino did not ask for a severance during the trial, nor did he raise this issue on appeal. The instant petition is the first time that he has claimed that the size of his trial violated due process.

The Supreme Court has held that if a § 2255 petitioner failed to properly raise an issue in trial or on direct appeal, he will be procedurally barred from raising the issue in a collateral attack unless he can show cause and actual prejudice. *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *United States v. Essig,* 10 F.3d 968, 979 (3d Cir.1993). To show "cause," a petitioner must demonstrate that the reason for failing to raise the issue is something that cannot be fairly attributable to him. To show "actual prejudice," a petitioner must establish that any errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension. *Frady,* 456 U.S. at 167–69, 102 S.Ct. 1584. Mr. Merlino has not demonstrated either cause or actual prejudice.

Even if we accepted Mr. Merlino's argument that the failure of his attorney to move for severance was the direct result of Petitioner's uninformed decision to proceed with a joint defense, Mr. Merlino still had the opportunity to raise his due process claim on direct appeal, but did not. Mr. Merlino has failed to show any cause for why he did not raise this issue with the Court of Appeals.

Mr. Merlino has also failed to show actual prejudice from being tried with his co-defendants. Mr. Merlino, like each of his 16 co-defendants at trial, was charged with RICO predicate acts involving murder. Thus, Mr. Merlino cannot claim to be a non-violent member of a RICO conspiracy linked to his detriment to other violent members of the same conspiracy. Since Mr. Merlino cannot show either cause for or actual prejudice from failing to raise this issue on appeal, he is procedurally barred from raising the issue in this collateral attack.

Even if this Court were to consider Mr. Merlino's due process claim, we would find it meritless. Federal Rule of Criminal Procedure 8(b) provides that defendants may be charged together "if they are alleged to have participated in the same act or transactions constituting an offense or offenses." The Supreme Court has recognized that "there is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Joint trials "'play a vital role in our judicial system,'" by promoting efficiency and serving "'the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id. (quoting Richardson v. Marsh,* 481 U.S. 200, 209–10, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). Here, Mr. Merlino, like all of his co-defendants, was charged in the indictment with RICO and RICO Conspiracy. We do not believe that the size and length of his trial violated due process. Quite the contrary, it is our belief that Mr. Merlino's trial with his co-defendants served the interests of efficiency and justice.

### E. Joint Defense Claims

Mr. Merlino seems to argue that he must receive a new trial because he, along with the 16 other defendants, pursued a joint defense strategy with Mr. Robert F. Simone, Nicodemo Scarfo's lawyer, as lead attorney. Though Mr. Merlino was represented by his own lawyer, Mr. Jacobs, Mr. Merlino claims that all of Mr. Jacobs's "actions had to be approved, in advance, by Simone," and that "Petitioner's attorney was not allowed to object, make a motion or argument or even ask a question of a witness without prior approval of Mr. Simone." *Motion* at 9–10.

Mr. Merlino presents a parade of conduct regarding Mr. Simone that he claims the government hid from him at trial.[5] Mr. Mer-

---

**5.** The list of conduct is as follows:

1. Simone was involved in Racketeering (18 U.S.C. § 1964(a) and (d)) from 1/1/80 to the date of his indictment, 10/1/87, with Scarfo, L. Merlino, Leonetti, DelGiorno, Iannece, Caramandi, and others. This time period overlaps the period of the instant indictment which encompassed Racketeering from April of 1976 to October of 1987. All of Simone's co-defendants were either co-defendants or co-conspirators of the petitioner in the instant case. Si-

mone personally cross-examined DelGiorno and Caramandi. He did so on behalf of all defendants;

2. Simone had an agreement with Scarfo and Botsaris, Beloff, and DiSalvo were "with" him [sic] and that he would share in the profits from their illegal activity;

3. In late 1983, Simone and Rago obtained, by use of threats, $5,000.00 from two drug dealers named Santonastasi and Wrubel;

4. In the spring of 1983, Simone and DiSalvo used extortion to collect a debt of $25,000.00 from Vincent Ponzio;

5. From September of 1983 to the end of 1984, Simone and others used threats to obtain $30,000.00 from Vincent DiBattista a/k/a Jimmy Milan;

6. In the summer of 1986, Simone attempted to obtain, by use of threats, $100,000.00 from Joseph Kanefsky. This was done with the assistance of Caramandi and DelGiorno, whom Simone was to later cross-examine;

7. In 1982, Simone collected an unlawful debt of $100,000.00 from Vincent Ponzio;

8. In the spring of 1983, Simone and DiSalvo collected an unlawful debt of $25,000.00 from Vincent Ponzio;

9. From December of 1985 to August of 1987, Simone and DiSalvo collected an unlawful debt of $200,000.00 from Leonard, Peter, and Arthur Pelullo;

10. Simone and DelGiorno conspired to defraud an Atlantic City, New Jersey casino by using the perjured statement under oath of DelGiorno;

11. Simone knowingly used perjurious testimony in obtaining an acquittal for Salvatore Scafidi, who was charged with murder;

12. Simone offered to use a bribe to have DelGiorno's record expunged;

13. Simone relayed messages to and from Scarfo which related to numerous crimes, thereby assisting in their completion;

14. Simone received $300.00 per week from DiSalvo's illegal loanshark business;

15. During the summer of 1986, at the behest of Simone, Caramandi approached Edward Zartsky as a "shake down" target. Together, they demanded $25,000.00 per year for him to pay for his previous involvement in the drug business;

16. Simone represented DelGiorno when he was called before the United States Grand Jury in November of 1987 and questioned before Assistant United States Attorney Louis Pichini. Pichini was the lead government attorney who prosecuted petitioner in the instant case. He never sought, nor did petitioner ever give, any waiver to the clear conflict when Simone cross-examined DelGiorno on behalf of the joint defense. Certainly, Pichini knew of the conflict. He never brought it to the attention of either the Court or petitioner;

17. Simone was the subject of ten (10) recorded meetings with a Federal Bureau of Investigation undercover agent from September 29, 1983 to November 15, 1984. The agent, who posed as a front man for David Kurzband, was introduced by Simone to Leonetti and others who would "open doors" with the Atlantic City casinos. One objective of this investigation was to have Simone solicit money from the agent as a payoff for influence with organized crime figures. Neither these tapes not the investigation was ever disclosed to petitioner. It was only at Simone's trial that this was disclosed (November 12–13, 1992) during the testimony of FBI Special Agent Ronald J. Moretti;

18. Simone was implicated in a Hobbs Act extortion of $650,000.00 in the District of New Jersey. Petitioner's co-defendant, Leonetti, was subsequently indicted for this offense on September 18, 1984. Simone represented Leonetti in this case. Before the indictment, in April of 1984, Simone was subpoenaed before the Grand Jury that was investigating this offense. He invoked the Fifth Amendment and broached the possibility of receiving immunity. Two days after Leonetti was indicted for this offense on November 20, 1984, the government sent a letter to Simone advising him that he was an unindicted co-conspirator, a witness to conspiratorial acts, and the subject of a continuing Grand Jury investigation.

*Motion* at 10–13.

Mr. Merlino further asserts that Mr. Simone's client, Mr. Scarfo, put a murder contract on the petitioner and his family.

The government has, in responding to Mr. Merlino's codefendants' § 2255 motions, taken issue with a number of Mr. Merlino's contentions. Taking these "facts" seriatim, the government has noted the following:

1. Simone had only one co-defendant in E.D.Pa. 91–569, later reported as *United States v. DiSalvo*, 34 F.3d 1204 (3d Cir.1994). That person was Anthony DiSalvo, who was not identified as a co-conspirator in the instant case. With regard to the instant case, while it is true that Simone cross-examined DelGiorno and Caramandi extensively and that his cross-examination benefitted all defendants including Merlino, it is always the case in joint trials with multiple counsel that cross-examination by one defendant benefits all. Merlino's counsel, like many of co-counsel, targeted specific areas rather than needlessly repeating general cross-examination that had already had its effect.

2. Information regarding Simone's relationship with Botsaris and DiSalvo came from Leonetti after he began to cooperate in mid–1989 well after the verdict in the instant case. Information about Simone's relationship with Beloff was contained in the discovery in this case which Merlino had.

3. The extortion of Santonastasi and Wrubel was listed as Racketeering Act 3 in the indictment of Simone in E.D.Pa. 91–569. Simone was acquitted of this racketeering act. *DiSalvo*, 34 F.3d at 1210.

4. The extortion of Ponzio was listed as Racketeering Act 5 in the indictment of Simone. This racketeering act was dismissed on a Rule 29 motion. *Id.*

5. The extortion of DiBattista was listed as Racketeering Act 6 in the indictment of Simone. This incident was revealed by Leonetti after he began cooperating in 1989, and Simone was acquitted of it. *Id.*

6. This attempted extortion was listed as Racketeering Act 7 in the indictment of Simone. Simone was acquitted of it. *Id.*

7. The indictment charged DiSalvo, but not Simone, with collection of unlawful debt from Ponzio in 1982.

lino argues that the government had an obligation to inform him of these facts and that their failure to so inform him requires that he be granted a new trial. Mr. Merlino further asserts that these undisclosed negative facts created a conflict of interest between the Petitioner and Mr. Simone that Mr. Merlino never had an opportunity to waive. Mr. Merlino also seems to argue that he deserves a new trial because Mr. Simone was house counsel to Mr. Scarfo's criminal enterprise and because if Mr. Simone "had loyalty to anyone other than himself, it was to Scarfo." *Motion* at 18. Unfortunately for Mr. Merlino, we cannot consider any of these arguments because the Petitioner failed to raise them on appeal and thus they are procedurally defaulted. Yet, even if we could consider Mr. Merlino's demand for a new

trial based upon Mr. Simone's "joint representation," we would dismiss each of his claims.

**1. Mr. Merlino's Joint Defense Claims are Procedurally Defaulted**

■ Mr. Merlino has failed to raise his joint defense claims on direct appeal. He is therefore procedurally barred from raising these claims for the first time in his § 2255 motion. Mr. Merlino had no cause for failing to raise these issues on appeal. Indeed, Mr. Pungitore, one of Mr. Merlino's co-defendants, raised joint defense issues very similar to Mr. Merlino's on appeal to the Third Circuit. *See Pungitore*, 910 F.2d at 1139–41. Furthermore, Mr. Merlino suffered no actual prejudice from engaging in a joint defense with Mr. Simone. The seventeen defense counsel involved in this case elected to pur-

8. The 1983 collection of unlawful debt from Ponzio was charged as Collection of Unlawful Debt 2 in the indictment of Simone. It was dismissed on Rule 29 motion. *Id.*

9. The collection of unlawful debt from the Pelullos was charged as Collection of Unlawful Debt 3 in the indictment of Simone. It was dismissed on Rule 29 motion. However, Simone was convicted of extortionate collection of credit [18 U.S.C. § 894] for these actions in Counts 5 and 6 of the indictment. In any case, this information came from Leonetti after he began to cooperate in 1989.

10. Simone's conspiracy with DelGiorno to defraud a casino by using a perjured statement was the subject of a June 2, 1987 FBI 302 of DelGiorno that was supplied to Merlino in discovery. He knew about this incident before trial.

11. Simone's knowing use of perjured testimony to obtain the acquittal of Merlino's co-defendant Scafidi in a separate state murder prosecution was also a subject of the June 2, 1987 FBI 302 supplied to Merlino in discovery before trial.

12. Simone's offer to use a bribe to have DelGiorno's record expunged was also a subject of the June 2, 1987 FBI 302 supplied to Merlino in discovery before trial.

13. Simone's conduct in relaying messages to and from Scarfo regarding numerous mob crimes was revealed by Leonetti after he began cooperating in 1989 and was the subject of his testimony in *DiSalvo*, 34 F.3d at 1207–1210.

14. Simone's regular receipt of money from DiSalvo's loansharking business was also a subject of the June 2, 1987 FBI 302 supplied to Merlino in discovery before trial.

15. As best the government can determine, Edward Zaretsky may be a mistaken name for Joseph Kanefsky (see 6. above). In any case, the government has found no charges brought

against Simone regarding an individual named Zaretsky.

16. The government is unaware of Simone representing DelGiorno before the grand jury in November, 1987, a year after he began cooperating. On the other hand, it is beyond dispute that Simone did represent DelGiorno at times before then. In fact, Simone so stated in open court with Merlino present. [N.T. 9/8/88, pp. 56–57]. Merlino's complaint that he was never given the opportunity to waive his resultant conflict of interest with Simone ignores the fact that Simone never entered an appearance on his behalf. Therefore, Merlino had nothing to waive.

17. The fact that Simone was the subject of consensually recorded conversations with a co-operating government witness in the Atlantic City casino investigation of 1983 and 1984 was a matter of public record. It was noted in *United States v. Simone*, 627 F.Supp. 1264, 1266–1267, 1272 (D.N.J.1986) and was the subject of extensive media coverage during the trial at which the tapes were played. All of this occurred before Merlino's indictment, arrest and trial in the instant case.

18. Simone's implication with Leonetti in a $650,000 extortion in New Jersey relating to the casinos, his pleading of the Fifth Amendment before the grand jury, his request for immunity, and the government's letter to him advising him that as an unindicted co-conspirator he had a conflict of interest, were all matters of public record recounted fully in the media and discussed in the District Court's opinion. *Id.*

*Government's Response to Phillip Narducci's 28 U.S.C. § 2255 Motion* at 28–30, n. 19.

We will not begin to reconcile the Petitioner's "facts" with the governments "facts". Even if every one of Mr. Merlino's "facts" is true, his joint defense claims still fail as a matter of law.

sue an overall unified defense strategy which consisted primarily of denying the existence and criminal purpose of *La Cosa Nostra,* denying the defendants' participation in it, and attacking the credibility of the government's principal cooperating witnesses. This strategy, consciously chosen by the defendants, had proven successful in several prior trials involving the same defendants. Hence, since Mr. Merlino can show neither cause nor prejudice, he is prohibited from raising his joint defense arguments in the instant motion. Still, even if Mr. Merlino's joint defense claims were not barred, they would fail on the merits.

### 2. Conflict of Interest

■ Mr. Merlino asserts that a conflict of interest existed between Mr. Simone and Mr. Merlino because Mr. Simone was allegedly involved in criminal activity with numerous individuals. He argues that "Simone's dilemma in cross-examining Caramandi and Del-Giorno and not getting into areas where his own criminality might be exposed, clearly required either his disqualification or a knowing, intelligent, and unequivocal waiver by petitioner." *Id.* at 15–16.

On September 9, 1988 the government raised the issue of a possible conflict of interest between Mr. Simone and his client, Mr. Nicodemo Scarfo. As discussed in open court on that day, Mr. Simone had been implicated by the cooperating witnesses in the extortion of Mr. William Rouse, a charged offense in the instant trial. In addition, the defendants were informed that a number of the photographs that the government planned to introduce as evidence included Mr. Simone, and that, one of the cooperating witnesses would testify that Mr. Simone was present during the discussion of one of the RICO predicate act murders. Tr. 9/9/88 at 44–47. Following this discussion,

and following an extensive colloquy, Mr. Scarfo waived these conflicts.

Mr. Merlino's argument that the court should have provided him an opportunity to waive Mr. Simone's conflicts as well neglects one crucial point: Mr. Simone was not his attorney during the fact-finding phase of the trial. Rather, Attorney Edwin Jacobs represented Mr. Merlino at trial.[6] Mr. Jacobs participated fully at trial, cross-examining both of the government's key witnesses—Mr. DelGiorno, Tr. 10/14/88 at 142–202, and Mr. Caramandi, Tr. 11/2/88 at 121–211, and presented a closing argument tailored specifically toward Mr. Merlino, Tr. 11/14/88 at 9–127. Thus, Mr. Merlino had the extra guarantee that any questions that he wanted asked of either Mr. DelGiorno or Mr. Caramandi could be asked by Mr. Jacobs, Mr. Merlino's own, personal attorney.

■ Under the law of the Third Circuit, it is inescapable that Mr. Merlino "cannot even assert a conflict of interest impeding Simone's representation of [him] because Simone represented only Scarfo. While Simone may have figured prominently in formulating and presenting the unified defense, that does not mean that he enjoyed an attorney-client relationship with every appellant in this case." *United States v. Pungitore,* 910 F.2d 1084, 1143 (3d Cir.1990). Indeed, the employment of a joint defense strategy does not establish an attorney-client relationship between every defense attorney and every defendant in a case. *Id.* Regardless of the conflicts that Mr. Simone may or may not have had during the fact-finding phase of trial, Mr. Merlino was not in a position to waive them because he was not Mr. Simone's client. *Id.* Therefore, the question of whether or not Mr. Merlino made a knowing, voluntary, or intelligent waiver consistent with the Sixth Amendment is moot.

---

6. Mr. Simone briefly stepped in for Mr. Merlino's attorney when Mr. Jacobs was on vacation in Germany. This, however, was during voir dere and early motion hearings. Tr. 9/8/88 at 6. Mr. Merlino signed a waiver permitting his attorney to be gone from the trial and allowing his interests to be represented by the other attorneys on the case. *See* Tr. 9/13/88 at 7–8. Mr. Jacobs represented Petitioner fully at the fact-finding phase of the trial.

Mr. Merlino's arguments regarding Mr. Simone's conflicts of interest never once refer to Mr. Simone's representation of Petitioner during voir dere. All of his arguments are tailored toward conflicts that allegedly existed at the fact-finding phase of the trial (e.g. that Mr. Simone could not effectively cross-examine the government's witnesses).

### 3. Government's Nondisclosure

Mr. Merlino also argues that we must grant him a new trial because Mr. Scarfo's attorney, Mr. Simone, had been involved in criminal activity with numerous individuals and the government "was fully aware of all these facts, but it chose to hide this information from the court and petitioner." *Motion* at 13.

Mr. Merlino does not say that he needed the evidence, if it in fact existed, because it exculpated him or because he needed to impeach Mr. Simone or another witness. Indeed, Mr. Simone's alleged criminal conduct is not *Brady* or *Jencks* material. Rather, Mr. Merlino argues that he should have been given the material only because it would have put him in a better position to intelligently and knowingly waive any conflicts he might have with Mr. Simone. *Motion* at 13.

However, Petitioner has not presented us with any caselaw, nor can we find any ourselves, that suggests that the government had an ongoing obligation to disclose all information suggesting Mr. Simone's criminality to even Scarfo, let alone to a person outside the attorney-client privilege like Mr. Merlino. Mr. Merlino simply argues that Mr. Simone's criminal activity created a conflict of interest with the Petitioner that he could not effectively waive. The fact that Mr. Simone was not Mr. Merlino's attorney, and therefore enjoyed no attorney-client relationship with him, makes the question of waiver of conflicts moot. The allegedly undisclosed evidence could not possibly have impacted Mr. Merlino's "waiver" of Mr. Simone's conflicts, because the Petitioner was not entitled to waive them in the first place. As a result, Mr. Merlino was simply not entitled to the evidence for the purposes he suggests. Without such an entitlement or right to review this evidence, the government cannot be faulted for failing to provide it. Therefore, Petitioner's argument that we must order a new trial because the government failed to disclose that Mr. Simone had allegedly been involved in criminal activity with numerous individuals must fail.

### 4. House Counsel

Mr. Merlino tries to convince this court that he should be granted a new trial because Mr. Simone was house counsel to La Cosa Nostra and therefore should have been disqualified by the Court. As previously discussed, Mr. Simone did not represent Mr. Merlino. Therefore, we find this argument unpersuasive.

### 5. Mr. Simone's Loyalty to Scarfo, Caramandi and DelGiorno

Mr. Merlino claims that "Simone's involvement on behalf of petitioner suffered from another defect ... [i]f Simone had loyalty to anyone other than himself, it was to Scarfo, Caramandi and DelGiorno" *Motion* at 18. Far from being a defect, we believe that Mr. Simone's loyalty was correctly directed toward his client, Mr. Scarfo. It is axiomatic that a lawyer's first responsibility is to his or her client. The seventh Cannon of the Model Code of Professional Conduct commands that "a lawyer should represent his client zealously within the bounds of the law." Indeed, "[a] lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor." ABA Model Rule of Professional Conduct 1.3 (1995 ed.). Thus, a "lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." *Id.* So, while Mr. Merlino's claim that Scarfo's lawyer was loyal to Scarfo is probably correct, it does not earn the Petitioner a new trial. And, as to Mr. Merlino's assertion that Mr. Simone was loyal to the government's witnesses, he has no standing to make such a conflict of interest claim since Mr. Simone was not his attorney. Mr. Jacobs spent a considerable amount of time cross-examining Mr. Caramandi and Mr. DelGiorno on the Petitioner's behalf. Mr. Merlino makes no contention that a conflict of interest existed between him and his own attorney.

### 6. Murder Contract

Petitioner also seems to argue that his Sixth Amendment rights were violated because Scarfo had put a murder contract on Petitioner and his family. What Scarfo did or did not do to influence Mr. Merlino's decisions at trial does not have any legal

weight. Mr. Scarfo may have had a personal impact on Mr. Merlino's decisions; however, as a third party, Mr. Scarfo's actions did not have a legal effect on Mr. Merlino's trial. *See United States v. Pungitore*, 965 F.Supp. 666, 673, n. 1 (E.D.Pa.1997). If, for example, Mr. Merlino's trial decisions had become overborne by his grandmother, evidence of that would not be relevant when determining whether Petitioner's Sixth Amendment rights were violated. *Id.* Indeed, the Third Circuit has already held that Mr. Simone did not engage in a joint defense of Mr. Merlino and his co-defendants. *Pungitore*, 910 F.2d at 1143. Thus, his argument that he must be granted a new trial because he was coerced into allowing Simone to act as lead counsel must fail.[7]

### F. Ineffective Assistance of Counsel

Mr. Merlino raises a number of ineffective assistance of counsel claims in both his original § 2255 motion and in the subsequent form motion filed at the request of this court. Generally, he asserts that "the cumulative effect of the petitioner having been coerced into a joint defense with Simone virtually dictating every step, by the (fix this sentence) [sic] coercion of Scarfo, who put out a murder contract on defendant and his family resulted in petitioner loosing [sic] his Sixth Amendment right to effective counsel[.]" *Motion* at 19. We will first lay out the proper standard for considering ineffective assistance of counsel claims. Next, we will consider each of the Petitioner's arguments in turn.

#### 1. Standard

The right to have the assistance of counsel is provided for by the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the Supreme Court; it cannot be denied to a defendant absent intentional and actual waiver. *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Supreme Court has set out a two-prong test to establish a claim of ineffectiveness of counsel.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner must show both that: (1) his counsel's conduct was deficient, and "fell outside the wide range of professionally competent assistance" and (2) the petitioner was prejudiced as a result of that deficient conduct. *Strickland*, 466 U.S. at 687; *United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

To satisfy the first prong, deficiency, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *See Id.* at 690, 104 S.Ct. 2052; *Diggs v. Owens*, 833 F.2d 439, 444–45 (3d Cir.1987), *cert. denied*, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."). Moreover, the mere fact that a tactic has been unsuccessful does not necessarily indicate that it was unreasonable. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

To guide us in determining the reasonableness of an attorney's performance, the Supreme Court in *Strickland* noted that the American Bar Association Standards may be referred to as a guideline. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *See also, Government of the Virgin Islands v. Weatherwax ("Weatherwax I")*, 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II")*, 77 F.3d 1425, 1435 (3d

---

7. Furthermore, we find it ironic that the Petitioner claims that "the government should have never allowed petitioner to be tried in the same forum as a co-defendant with someone they knew wanted petitioner and his family killed." *Motion* at 19. Mr. Merlino spent years working for Mr. Scarfo as his second in command of the Philadelphia Mafia. Thus, the argument that Mr. Merlino could serve as Mr. Scarfo's right-hand man, but cannot be tried in the same forum holds little water.

Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 538, 136 L.Ed.2d 423 (1996).

██ One of the most relevant standards in this context is ABA Standard for Criminal Justice § 4–5.2 (3d ed.1993), "Control and Direction of the Case." This section dictates which decisions are ultimately to be made by the defendant and which are to be made by the defense counsel. Specifically, strategic and tactical decisions such as which witnesses to call, whether to conduct cross-examination, and what trial motions to make are within the province of the attorney after consultation with the client. ABA Standard 4–5.2(b). The Commentary thereto states that when the attorney in question makes such strategic or tactical decisions, "[o]nly when [his] behavior reveal[s] ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel." *Weatherwax I,* 20 F.3d at 579, *citing* Commentary at 4.67–68. Therefore, if a decision falls within the realm of "strategic decisions" to be made by the attorney, we will find whatever decision that attorney made to be sufficiently deficient *only* if he either failed completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound.

If the first prong is proven, a petitioner must also prove the second prong, prejudice. To show prejudice, a petitioner must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal,* 10 F.3d at 104, *citing Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### 2. Failure to Sever

██ Mr. Merlino argues that Mr. Jacobs failed to represent him effectively by not pursuing a motion to sever his case from the cases of his 16 co-defendants. *Motion* at 19. This complaint is without merit. Whether or not to make a motion is clearly an "attorney decision." *See Weatherwax II,* 77 F.3d at 1435. Hence, Mr. Merlino must overcome the presumption that his counsel's actions were within the objective standard of reasonableness by showing that the decision to not move for severance was not sound trial strategy. *See Darden,* 477 U.S. at 169, 106 S.Ct. 2464.

In the instant case, good strategic reasons existed for Mr. Jacobs's decision not to move for severance. First, motions to sever are disfavored in complex cases. The instant case involved seventeen defendants, ten counts, including forty racketeering acts, and lasted for fifty-three trial days. Mr. Merlino's co-defendant Joseph Pungitore had already filed a pre-trial motion for severance which had been denied by the court. That denial was ultimately affirmed on post-verdict motions. *United States v. Scarfo,* 711 F.Supp. 1315, 1340–42 (E.D.Pa.1989), *aff'd, United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990).

Second, the 17 defense counsel involved in this case had elected to pursue an overall unified defense strategy. A motion to sever would have been directly counter to such a strategy, which had proven successful in several prior trials involving the same defendants.

Finally, as the Third Circuit stated in a footnote in the direct appeal of this case, failing to request a severance was not ineffective assistance under these facts since "given the strength of the government's case against the appellants, their attorneys might have had a difficult time convincing the trial court that the evidence implicating Simone would cause such severe prejudice as to require a severance." *Pungitore,* 910 F.2d at 1143 n. 85. In light of this, Mr. Jacobs's decision was not unreasonable; on the contrary, it was a deliberate tactical decision well within the bounds of reasonable professional assistance.

As to Mr. Merlino's reference to a murder contract put out on him and his family by Scarfo, Mr. Merlino does not contend that his attorney knew about the contract before tri-

al. Instead, he claims that this information came out during the examination of the government witnesses. *Motion* at 18. Therefore, Mr. Jacobs cannot be deemed ineffective for not requesting a severance based on information that he did not know.

As there is no evidence of deficient performance on the part of Mr. Jacobs, we need not discuss the question of prejudice resulting from Mr. Jacobs's decision not to seek a severance. The same reasoning for holding that Mr. Jacobs was not ineffective for failing to ask for a severance applies to Petitioner's argument that Mr. Jacobs was ineffective for not asking the court to disqualify Mr. Simone. Therefore, this prong of Mr. Merlino's ineffective assistance of counsel fails.

### 3. Conflict of Interests

 Mr. Merlino attempts to incorporate the conflict of interests argument, dismissed in Part E of this opinion, into his ineffective assistance of counsel claim. *Petitioner's Standard 28 U.S.C. § 2255 Form* at 4. As discussed, Mr. Simone was not Mr. Merlino's attorney. Mr. Simone merely helped represent the Petitioner during voir dire when Mr. Jacobs was out of the country. Mr. Merlino never asserts that Mr. Simone did not represent him effectively during jury selection. As to any claims that Mr. Simone was ineffective during the trial, it is axiomatic that the Petitioner cannot bring an ineffective assistance of counsel claim against him since he was not Mr. Merlino's attorney.

### 4. Failure to Call Witnesses

Mr. Merlino complains that, because of the joint defense strategy with Mr. Simone, Petitioner somehow lost his right to call witnesses.

 The decisions of which witnesses to call to testify are strategic and therefore left to counsel. *See* ABA Standards of Criminal Justice, Standard 4–5.2; *Diggs v. Owens,* 833 F.2d 439, 446 (3d Cir.1987), *cert. denied,* 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988). Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case. *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990); *see also United States v. Griffin,* 1993 WL 34927 (E.D.Pa.1993), *aff'd,* 16 F.3d

406 (1993). Indeed, this is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second-guessing. *See Sanders v. Trickey,* 875 F.2d 205, 212 (8th Cir.), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989).

 Mr. Merlino makes a vague contention that his lawyer's joint representation with Mr. Simone caused the Petitioner to lose his right to call witnesses. He presents no support for the contention that his lawyer, Mr. Jacobs, either was required to, or should have, called additional witnesses to the stand. He does not even suggest which additional witnesses Mr. Jacobs might have called. The blanket, unsupported contention that Mr. Merlino was somehow prevented from calling witnesses does not convince us that Mr. Jacobs's representation of Mr. Merlino was deficient or that the fact that additional witnesses were not called prejudiced the Petitioner's case. And, in any case, "[m]ere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation." *United States v. Vincent,* 758 F.2d 379, 382 (9th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985). We will not second guess Mr. Jacobs' tactical decision on which witnesses to call.

### 5. Mr. Merlino's Decision Not to Testify

Mr. Merlino claims that "the cumulative effect of petitioner being coerced into a joint defense with Simone virtually dictating every step, by the coercion of Scarfo ... resulted in the defendant losing his Sixth Amendment right to effective counsel and foregoing ... [his right] to testify in his own behalf." *Motion* at 19.

 The decision whether or not to testify is extremely important, and thus one left entirely to the defendant. ABA Standards for Criminal Justice, Standard 4–5.2; ABA Model Rule 1.2. While the defendant may, and should, receive advice from his attorney, this fundamental right cannot be contravened by an attorney even if the defendant's decision causes strategic damage. *See United States v. Teague,* 953 F.2d 1525 (11th

Cir.), *cert. denied,* 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992).

██ However, Mr. Merlino does not claim that his lawyer refused to allow him to testify.[8] Instead, he is asserting that "based on death threats from the lead defendant (Nicodemo Scarfo) and because of the position of the lead defense attorney (Robert Simone) [Petitioner] was precluded from discussions concerning the presentment of the defense." *Motion* at 7. In other words, he is arguing in that Mr. Scarfo and Mr. Simone's joint defense strategy prevented him from considering testifying at trial.

We believe that because neither Mr. Scarfo nor Mr. Simone were Mr. Merlino's counsel during the evidence phase of the trial, their actions and their "joint defense" did not impact Mr. Merlino's legal right to testify. Of course, Mr. Simone and Mr. Scarfo may have had a personal impact on Mr. Merlino's decisions; however, as a third party, any coercion by Mr. Simone or Mr. Scarfo simply did not have the *legal* effect of denying Mr. Merlino's right to decide whether to testify.

If, for example, Mr. Merlino's desire to testify had become overborne by his grandmother, evidence of that would not be relevant to the allegations of ineffective assistance of counsel made in his § 2255 petition. Moreover, outside of an ineffective assistance claim, Mr. Merlino could not successfully claim that Mr. Simone interceded to violate his Sixth Amendment right to testify directly because Mr. Simone was not (a) his counsel, (b) the prosecution, or (c) the court. As such, Mr. Merlino's instant claim is without merit.

## 6. Failure to Object to Prosecutor's Comments During Closing Which Constituted Improper Vouching For a Government Witness

Mr. Merlino next makes a twofold argument. He first argues that the government improperly vouched for its witnesses during closing. Based on that, he states that Mr. Jacobs was deficient by not objecting to the vouching. Therefore, we must first turn our attention to the question of whether there was vouching by the government at all.

██ Mr. Merlino makes reference to both the government's closing, in which the government discussed Mr. DelGiorno's and Mr. Caramandi's credibility, and the government's rebuttal, in which they discussed the credibility of the law enforcement personnel who had testified. Generally, it is improper for a prosecutor to vouch for the veracity of a government witness. "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." *United States v. Roberts,* 618 F.2d 530, 533 (9th Cir.1980) (*citing Lawn v. United States,* 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981). We have reviewed the entire transcript of the government's closing, and can find no vouching whatsoever in reference to Mr. Caramandi or Mr. DelGiorno. The prosecutor merely argued the evidence in the record; he did nothing improper. Since there is absolutely no evidence that any perjury was committed, or that the government had knowledge thereof, reference to the tes-

---

**8.** Indeed, nowhere in Mr. Marrone's affidavit submitted with Petitioner's motion does he state that Petitioner's trial attorney, Edwin Jacobs, refused to allow Mr. Merlino to testify. Moreover, any claim that a defendant in the instant case was not permitted to take the stand by his attorney despite expressing a desire to do so would be contrary to the trial record. At the close of the defense case, the jury was excused and attorney Simone, who was acting as lead counsel for the defendants, stood in front of the bench and asked the following of all the defendants at the request of the court:

With that, your Honor, we would move into evidence the exhibits that have been marked during the government's case, as well as those

few that have been marked during the defense case, and I believe, if anybody disagrees with me raise their hand, I believe all of the defendants would rest, is that correct?

Tr. 11/9/88 at 110–11.

We looked about the courtroom and as the record reflects, there was no response from anybody. The meaning of the question was clear and any defendant who wanted to testify could have so indicated at that time.

But, in any case, Mr. Merlino has not claimed that his attorney prevented him from taking the stand on his own behalf. Instead, he is asserting that the coercion from Mr. Simone and Mr. Scarfo was the reason he asserted his Fifth Amendment rights.

**664**

timony of the government witnesses in closing is entirely appropriate.

We have also reviewed the government's rebuttal. Mr. Merlino references the Third Circuit's opinion in *Pungitore.* The Court of Appeals did note that there were portions of the rebuttal summation in which the prosecutor "attempted to bolster the credibility of testifying law enforcement personnel and the prosecutorial team by invoking facts which had no foundation in the record." *U.S. v. Pungitore,* 910 F.2d 1084, 1125 (3d Cir.1990). The court went on to state that the defendants had not preserved their objections for appeal, and therefore, the *per se* error rule delineated in *United States v. DiLoreto,* 888 F.2d 996 (3d Cir.1989) could not apply. Mr. Merlino seems to argue that Mr. Jacobs's failure to object during trial constituted deficient assistance.

▉ However, we note first that the *per se* error rule in *DiLoreto* was overruled by the Third Circuit in *United States v. Zehrbach,* 47 F.3d 1252 (3d Cir.), *cert. denied,* 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995) ("the *per se* reversal standard announced in *DiLoreto,* however, conflicts with the Supreme Court case law requiring the court to analyze prosecutorial comments case by case, in the context of the entire trial, and reverse only where the defendant has suffered prejudice."). As a result, Mr. Jacobs's failure to object is not inherently error. Instead, the prosecutor's comments in the rebuttal summation must first be reviewed pursuant to the harmless error doctrine to determine if the defendant received a fair trial before we can decide if it was unreasonable to not object. *Id.* at 1267.

▉ The Third Circuit has already held that the comments made in this case by the prosecutor in rebuttal were an "invited response." *Pungitore,* 910 F.2d at 1123. The Third Circuit further explained this kind of issue in *United States v. Pelullo,* and noted that

where there is no foundation for the defendant's assertions, the prosecutor will un-

doubtedly feel the need to respond during rebuttal which often leads to improper vouching as to the credibility of witnesses or to the prosecutor's own integrity or that of his or her office. Where the defense has made improper remarks, the "reply" or "invited response" doctrine permits the prosecution to attempt to neutralize the remarks, so long as he or she does not use the defendant's accusation as a springboard affirmatively to attack the defense. 964 F.2d 193, 218 (3d Cir.1992); *See United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

In the instant case, the unified defense strategy focused on attacking the credibility of all of the government witnesses and the credibility of the numerous law enforcement officers involved. The Third Circuit recounted in *Pungitore* the various defense closings and stated

[defense attorney Simone] analogized the prosecution of the Scarfo family to the government's attempt to bury unions in the 1930's, the interment of the Japanese during World War II, the blacklisting of communists during the McCarthy era, the circumstances leading to the Kent State riots, the persecution of Vietnam protestors, and ultimately, in his *piece de resistance,* to the Spanish Inquisition.

*Pungitore,* 910 F.2d at 1122.

The defendants, in several different closings, clearly suggested that the law enforcement personnel had fabricated testimony against the defendants. The rebuttal statements of the prosecutor, while zealous, were made only in response to the defendants' collective allegations, and were therefore not improper under the circumstances.

Since the government's comments in closing were not improper vouching, Mr. Jacobs's failure to object is not deficient conduct.

**7. Failure to Object to Train Analogy**

▉ Mr. Merlino also attacks his attorney's failure to object to our use of the "train analogy" language from *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) in instructing the jury about conspiracy.[9] One

---

9. The Court instructed the jury that
 a conspiracy is like a train, and where one party knowingly steps on board that train he's part of the crew. Knowingly now. He becomes a part of the crew and assumes conspir-

ators' responsibility for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.
Tr. 11/19/88 at 116.

defendant objected and a clarifying instruction was given.[10] No further objection was made to the supplemental instruction. The Court of Appeals reviewed the use of the analogy for plain error. *Pungitore,* 910 F.2d at 1147. Mr. Merlino now says that his attorney was ineffective for not objecting to the train analogy as well. All this is immaterial, because notwithstanding the applicability of the plain error standard of review, the Court of Appeals held that "the disputed comments were an accurate explanation of substantive conspiracy law." *Id.* Thus, Mr. Jacobs cannot be faulted for failing to preserve a meritless issue for appeal.

### 8. Failure to Object to Government's Use of Expert Testimony

■ On direct appeal Mr. Merlino and his co-defendants challenged the government's use of Special FBI Agent James Kossler, an expert on the structure of organized crime families within La Cosa Nostra, to identify individuals meeting with various co-defendants in several surveillance photos as major New York Mafia figures and associates. *Pungitore,* 910 F.2d at 1148. The Court of Appeals reviewed this challenge for plain error since the defendants did not object to this testimony at trial. *Id.* Mr. Merlino now claims that Mr. Jacobs's was ineffective because he failed to properly preserve this issue for appeal.

This argument too fails on its merits. As the Third Circuit explained in *Pungitore,* "[t]he overriding limitation on expert testimony is the requirement '[u]nder [Federal Rules of Evidence] 701 and 702, [that] opinions must be helpful to the trier of fact.'" *Id. (quoting United States v. Theodoropoulos,* 866 F.2d 587 (3rd Cir.), *mandamus denied,* 489 U.S. 1009, 109 S.Ct. 1179, 103 L.Ed.2d 246 (1989), *overruled on other grounds, United States v. Price,* 76 F.3d 526 (1996))* (internal quotation omitted). According to Rule 704, "an expert opinion 'is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" *Id. (quoting* Fed.R.Evid. 704(a)). Using these principals, the Court of Appeals stated that

several courts, including this one, have approved the admission of expert testimony in circumstances in which stronger arguments against admissibility could be made than in this case. *See e.g., United States v. Angiulo,* 897 F.2d at 1189 (expert could testify as to roles defendants played in illegal gambling operation); *Theodoropoulos,* 866 F.2d at 591–92 (same, in context of complex narcotics organization); *United States v. Kinsey,* 843 F.2d 383, 387–89 (9th Cir.), *cert. denied,* 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988) (police officer could testify about defendant's involvement in the distribution of cocaine).

*Pungitore,* 910 F.2d at 1148.

The Court of Appeals held that FRE 702's helpfulness requirement was met since the expert's testimony provided the jury with "useful background information as to the structure of La Cosa Nostra families and the interplay between them on the national level," and that "his identification of Scarfo and the New York bosses in the photographs was merely incidental to that testimony and did not implicate them in any crimes." *Id.* at 1149.

The Court of Appeals stated that they "would be hard pressed to find that the admission of [the expert's] testimony constituted error, much less plain error," and that the expert's "testimony fell squarely within the boundaries of admissible expert testimony." *Id.* Thus, since the government's use of the Mafia expert's testimony was proper, Mr. Merlino's lawyer was not deficient by failing to object to the testimony at trial.

---

**10.** The supplemental instruction went as follows: I want to stress one thing. I gave you the example of the train and that was quoted from *United States v. Barnes* [sic]. But I want to emphasize one word because I think its important.

Proof of membership in the Mafia in and of itself is not sufficient to convict. Now I told you that conspiracy is like a train, and it is.

But when a party steps aboard it must be knowingly. You've got to know. Then he is part of the crew and assumes conspirators responsibilities. And he assumes those responsibilities for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.

*Id.* at 136.

### 9. Failure to Object to Court's Curative Instruction in Reply to the Government's Quantification of Reasonable Doubt

Mr. Merlino appears to claim that his attorney was deficient in failing to object to the court's curative instruction given in response to the government's quantification of reasonable doubt in its closing argument. *Motion* at 20. This contention too lacks merit.

 In the government's opening statement, the government compared the unfolding of evidence to a jigsaw puzzle. Tr. 9/28/88 at 44–46. During the co-defendants' closing arguments Mr. Jacobs adopted the government's jigsaw analogy and argued that some pieces were missing and other pieces were fake. Tr. 11/14/88 at 10. In his rebuttal argument, the prosecutor admitted that a few "pieces" were missing, but argued that the puzzle was complete enough to preclude any reasonable doubt and that the government's case was like a 500 piece puzzle with eight pieces missing. Tr. 11/16/88 at 305–06. Mr. Jacobs, then requested a curative instruction stating that

> [t]his depiction of a puzzle which has just been displayed to the jury was described by Mr. Gordon as a 500 piece puzzle which is missing 8 pieces. He has suggested to the jury ... that a miracle [sic] or quantum approach, reasonable doubt is appropriate. That is as far as I know a proposition not endorsed by the case law. It is not at all consistent with the description of reasonable doubt that you would give the jury. I would think they should be so instructed. I don't want them to sleep on the proposition that they are approach their assessment of who beyond a reasonable doubt of such a numerical basis [sic]. This equates to one and a half per cent proofs missing [sic] and if you had said that to the jury, that would clearly be improper. It's something that the court has to clear up right away before they sleep on it.

*Id.* at 307.

We responded to defense counsel's request stating we would "give them the curative instruction just to be absolutely safe." *Id.* We then instructed the jury as such:

> I have told you a number of times that I will be reciting the law to you and I will tomorrow morning at 9:30, but just so that we're absolutely sure again, we remember the rules. The law will be as I and I alone give it to you and it is not as the attorney might give it to you. I have heard a number of references to reasonable doubt. I believe that Mr. Jacobs was the one that told you something about its leaving a coffee pot on when· you drive along. I believe Mr. Berry had a brick and a scale or some thing. There were objections to some of these, to some there were not. *You saw a jigsaw puzzle and I think they mentioned that there were so many pieces in the jigsaw puzzle. None of these things is really the measure of reasonable doubt.* I'm going to tell you what the definition of reasonable doubt is and then it will be up to each one of you to decide whether or not you have a reasonable doubt. You will be guided by my instructions and my instructions alone, of course.

*Id.* at 308–09.

The next day we instructed the jury on the issue of reasonable doubt:

> [A]s I have said many times, and I believe we have repeated it several times during the closings, the government has the burden of proving each defendant guilty beyond a reasonable doubt, and I believe I've told you before, but I'll say it again.

> Some of you have served as jurors in civil cases, and I only mention this to make absolutely certain there is no confusion, and in a civil case you would have been told that it was only necessary that the parties seeking to recover, the plaintiff, prove their evidence by a fair weight of the preponderance of the evidence. That is, prove that a fact is more likely true than not true, and the judge in a civil case would have made reference to the scales and said that they need only tip the slightest bit in favor of the plaintiff in order for the plaintiff to have sustained their burden of proof. That is not—I repeat not the standard in a criminal case.

> In a criminal case the burden of proof is far higher. In a criminal case the government's proof must be more powerful than

that. It must be beyond a reasonable doubt.

The government does not have to prove the whole case beyond a reasonable doubt but only the elements of the crimes charged.

Now a reasonable doubt may arise from the evidence presented or the lack of evidence presented with respect to some element of the crimes charged.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt. Another definition is that a reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in their own affairs.

Now ladies and gentlemen of the jury, there are very few things in the world that we know with absolute certainty, and in criminal cases the law does not require proof that it overcomes every possible doubt.

If, based upon your consideration of the evidence, you are firmly convinced that a defendant is guilty of a crime charged, then it is your duty to find him guilty.

On the other hand, if you think there is a reasonable doubt, and that's your personal decision to make, then you must find the defendant to guilty [sic] as to that offense or offenses as to which you have a reasonable doubt.

You may not find a defendant guilty based upon mere speculation, mere suspicion of guilt or mere probability of guilt. Or guesswork. There must be proof beyond a reasonable doubt, and again its up to each one of you to determine whether or not you have a doubt, and if you have a doubt it's up to you to determine whether or not that doubt is a reasonable doubt. . . .

I remind you again that the government has the burden of proof, the only burden of proof in a criminal case, and that burden of proof again is beyond a reasonable doubt. It is not up to any defendant to prove that he is not guilty.

Tr. 11/17/88 at 11–13.

As the Court of Appeals has pointed out in *Pungitore*, the defendants were not prejudiced by the prosecutor's quantification of reasonable doubt since the argument "was a fair reply to defense counsel's own revival of the jigsaw puzzle analogy." 910 F.2d at 1128. Thus, the defendants were not entitled to a curative instruction in the first place. And, even if the defendants were so entitled, the purpose of the curative was to cure any prejudice that may have resulted from the government's quantification. Our curative instruction, coupled with our instruction given the next day regarding reasonable doubt, was more than sufficient to ensure that the jury understood that they were not to quantify reasonable doubt. Therefore, Mr. Merlino's attorney cannot be faulted for not objecting to a curative instruction that: (1) he, himself, requested and (2) was more than sufficient to cure any prejudice that the prosecutor's remarks may have caused. Furthermore, the Court of Appeals has already held that the defendants did not suffer prejudice from the prosecutor's remark. *Id.* Therefore this portion of Mr. Merlino ineffective assistance of counsel claim must fail.

### 10. Failure to Object to Prosecutor's Inflammatory Remarks

Mr. Merlino further claims that Mr. Jacobs was ineffective because he did not object to inflammatory comments made by the prosecutor, though he fails to state to which inflammatory comments he is referring. Petitioner merely points us to the Court of Appeals' opinion which stated that "'[i]nasmuch as no objection was made to the above comments, they are reviewable only for plain error.'" *Motion* at 20 (*quoting Pungitore*, 910 F.2d at 1128). The comments that the Court of Appeals referred to as being reviewed for plain error were not the prosecution's references to Iannarella as a "cold-blooded murderer," Tr. 11/18/88 at 115, to various other defendants as "mob killers," Tr. 11/16/88 at 272, and to Joseph Grande, Phillip Merlino and Frank Merlino as "follow[ing] in their fathers' footsteps," Tr. 11/11/88 at 79. Instead, the Court of Appeals was referring to the government's explanation for why one witness testified in disguise and why other witnesses would not positively identify those defendants responsible for murder. *Pungitore*, 910 F.2d at 1128. As for the comments which Mr. Merlino finds inflammatory, the Court of Appeals explicitly

stated that they found "no prosecutorial misconduct in these comments, as we agree with the district court that they were fair comment on the evidence adduced at trial." *Id.* at 1127 (internal citation omitted). Hence, Mr. Jacobs cannot be blamed for not objecting to these comments which both we and the appellate court found to be proper.

### 11. Failure to Object to Delay in Producing Jencks Material

Petitioner next argues that his attorney's counsel was ineffective because he failed to inform the trial court that the government had delayed in providing *Jencks* material regarding the extortion of a victim named Leone. When Salvatore Scafidi raised this argument on appeal, the Third Circuit dismissed the claim as "frivolous." *Pungitore,* 910 F.2d at 1136. Defense counsel cannot be faulted for failing to raise a frivolous claim at trial.

### 12. Failure to Object to Evidence Implicating Attorney Simone in the Rouse Extortion

■■ Mr. Merlino argues that "perhaps the most notable failure by defense trial counsel involved the area of the implication of Simone in the Rouse extortion." *Motion* at 21. He essentially argues that "his defense suffered a prejudicial spillover of evidence implicating Simone." *Pungitore,* 910 F.2d at 1143. When Mr. Merlino raised this issue with the Court of Appeals, the court stated that "[i]f at trial, appellants believed that the spillover effect of the evidence was likely to influence unfairly the jury's verdict against them, they could have moved for severance on that ground or requested other curative measures. Their failure to do so is fatal to the claim they raise on appeal." *Id.* Mr. Merlino now claims that this failure mandates that we find that he had ineffective assistance of counsel at trial. We reject the Petitioner's demand.

Petitioner's argument here is, for the most part, a resurrection of his claim that Mr. Jacobs was ineffective for failing to ask for severance. As we have already explained in detail, this claim is meritless. *See* Part F(2), *supra.*

As to Mr. Merlino's argument that Mr. Jacobs should have objected to the introduction of evidence implicating Mr. Simone, the Court of Appeals has already "determined that the evidence concerning Simone was relevant and material to the charges being tried, and therefore the government's use of it was entirely proper." *Pungitore,* 910 F.2d at 1144. Therefore, Mr. Jacobs's counsel cannot be called ineffective for failing to object to admissible evidence.

Mr. Merlino also contends that his counsel was not present at the sidebar where the government informed the defendants of their intent to elicit evidence concerning Mr. Simone's participation in the Rouse extortion. Mr. Merlino's petition states that

> [The Court of Appeals] plainly held that a prosecutor may introduce relevant evidence implicating a defense attorney in the same criminal activities charged against the accused "... provided that advance warning is given to the. defense so that there is an opportunity for appropriate motions." In the instant case, Petitioner did not receive advance warning and appropriate motions were not made. This failure by trial counsel alone constitutes ineffective representation.

*Motion* at 21–22 (*quoting Pungitore,* 910 F.2d at 1142).

We are confused as to what the Petitioner is arguing here. If he is asserting that Mr. Jacobs was ineffective because he was not informed by the government about their intent to implicate Simone in the Rouse extortion, then this argument fails because an Mr. Jacobs cannot be called ineffective for the government's alleged failure.

■■ If, on the other hand, Mr. Merlino is claiming that Mr. Jacobs was ineffective for failing to move for a severance once he learned of the government's intent to use this evidence at trial, then this argument fails since we have determined that Mr. Jacobs was not ineffective for pursuing a joint defense strategy that had proven successful for the Petitioner on prior occasions.

And, if the Petitioner is arguing that defense counsel was ineffective for either failing to object to the admission of this evidence because he had not been informed by the government or for not asking the court

to give a curative instruction, then this claim fails as well. As we have already discussed, the Third Circuit has already held that the government's use of this testimony was proper. *Pungitore,* 910 F.2d at 1144. Furthermore, any prejudice that may have resulted from the alleged "spillover effect" was minimal in comparison to the overwhelming evidence proving beyond a reasonable doubt that Mr. Merlino had engaged in four murders, three attempted murders, six murder conspiracies, one gambling offense, two illegal debt schemes, two distributions of methamphetamine and numerous extortions completely unrelated to that for which Mr. Simone was implicated.[11]

▮ Mr. Merlino also seems to argue that his attorney was ineffective for failing to ask the court to disqualify Mr. Simone because he was implicated in the Rouse extortion. We disagree. The government brought up this issue of the Rouse extortion with the court. Tr. 9/9/88 at 44–58. This very same issue had been brought up in a previous case before Chief Judge Fullam. Judge Fullam decided not to disqualify Mr. Simone in that case. *Id.* Instead, the court limited the areas on which Mr. Simone could testify. *Id.* at 45. After considering the issue we stated that we would

> take a very similar tact that the Chief Judge took but I will say this, I'm not going to preclude any lawyer from cross-examining any witness about anything, okay, but I'm not going to allow [Mr. Simone] to inject your personal theory and if you do, I'm going to bring you up short.... And I will also tell the Government to instruct its witnesses. I don't want any, you were theres and you ought to knows.

*Id.* at 50–51.

We considered the issue of disqualifying Mr. Simone and decided against it. Petitioner's attorney cannot be faulted for not asking for disqualification after the court had fully considered the issue. Therefore, we find that Mr. Merlino's final substantive ineffec-

tive assistance of counsel claim, like the 11 that preceded it, is without merit.

### 13. Combined Effect of All Alleged Errors

Mr. Merlino finally contends that while "an individual error might be egregious, it is petitioner's position that the *cumulative effect* of all the shortcomings of defense trial counsel amounted to ineffective representation." *Motion* at 23 (emphasis in original). As we have discussed, not one of Mr. Merlino's ineffective assistance of counsel claims has merit. Therefore, the cumulative effect of each non-error does not add up to ineffective assistance of counsel: zero plus zero is still zero.

### G. *Joinder With Co–Defendants' Habeas Corpus Motions*

▮ Mr. Merlino also asks that we allow him to join in the Habeas Corpus motions filed by his co-defendants. We will deny this request as inappropriate. The purpose of a Habeas Corpus motion is to examine whether a petitioner's conviction was in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255. As such, we must examine Mr. Merlino's conviction individually. Indeed, a number of this issues raised in the co-defendants' motions are particular to those defendants and would not apply to the Petitioner. If Mr. Merlino's attorney wished to raise specific issues discussed in the co-defendants' Habeas Corpus motions, he should have done the work and included those arguments in the instant motion. Furthermore, we have already denied the Habeas Corpus motions of six of Mr. Merlino's codefendants. Mr. Merlino's request to join their motions would be moot. Therefore, we will deny Mr. Merlino's request to rest on the coattails of the co-defendants' attorneys.

### III. CONCLUSION

A thorough review of the record in this matter directs the conclusion that Mr. Merli-

---

11. We find it difficult to believe that Mr. Jacobs was not aware of the fact that Mr. Simone was implicated in the Rouse extortion in the first place. Mr. Jacobs is a member of the Philadelphia bar, and the prior trial involving this matter was widely publicized. Also, Mr. Simone's in-

volvement in the Rouse extortion was fully disclosed in the government's pre-trial discovery. Trial transcripts, grand jury transcripts, and FBI reports discussing the matter were all provided to defense counsel.

no is not entitled to relief, except for an amendment to his pre-sentence report reflecting his acquittal on the state murder charge. This court did not consider Mr. Merlino's state murder conviction when we levied our sentence, so Mr. Merlino is not entitled to resentencing based on his subsequent acquittal. Petitioner was properly given consecutive sentences for RICO and RICO Conspiracy, but in any case, he failed to raise this issue properly. Mr. Merlino's due process rights were not violated by the size and length of his trial, but again, he failed to raise this issue properly in the first place. Petitioner's joint defense arguments are procedurally barred. And, even if we were to consider these arguments, they must fail since Mr. Merlino was not entitled to waive any conflicts that he might have had with Mr. Scarfo's attorney. Furthermore, the government was not required to provide Mr. Merlino with information about these alleged conflicts. Finally, Mr. Merlino did not receive ineffective representation by counsel at trial.

For the above stated reasons, we will deny Mr. Merlino's motion for relief pursuant to 28 U.S.C. § 2255, except to amend Mr. Merlino's pre-sentence report.

An appropriate order follows.

### ORDER

AND NOW, this 17th day of September, 1997, upon consideration of Salvatore Merlino's Motion for a Writ of Habeas Corpus, a New Trial, an Order to Vacate Sentence, Correction of Pre–Sentence Report, an Order to Compel the Production of a Copy of the Petitioner's Pre–Sentence Report, an Evidentiary Hearing, and an Order Authorizing the Petitioner to Join in Similar Motions Filed by Co–Defendants, filed April 23, 1997, and his Form Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, it is hereby ordered:

1. That Petitioner's request that his presentence report be amended to reflect his acquittal of the murder of Frank D'Alfonso and that he be provided a copy of his presentence report is GRANTED.

2. That the remainder of Petitioner's motion is DENIED.