**Paul S. LEVAN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV. 00–2146.**

United States District Court, E.D. Pennsylvania.

Jan. 18, 2001.

Dina A. Keever, AUSA, Philadelphia, PA for government.

Paul M. Yatron, Reading, PA for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Presently before this Court is the motion of Paul S. Levan ("Petitioner" or "Levan") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2555, which was filed on April 25, 2000. For the reasons set forth below, this motion will be denied. Our review of the case leads us to consider whether the recent decision of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applies on collateral attack.

## I. BACKGROUND

On May 1, 1997, Levan was arrested by agents of the Drug Enforcement Agency ("DEA") on a charge of Conspiracy to Manufacture Methamphetamine. He was later indicted and charged with a single count pursuant to 21 U.S.C. § 846. The government contended that Levan conspired with Mr. Walter Slotcavage ("Slotcavage") to manufacture methamphetamine. Slotcavage was arrested, indicted and later pled guilty to the same charge Levan was convicted of.

Levan proceeded to trial on July 22, 1997, with Edson Bostic, Esq. representing him. United States Attorney Alan Kaiser represented the government. This trial ended in a mistrial, as the jury was unable to agree to a verdict.[1] The trial was rescheduled for August of 1997. Due to the unavailability of Mr. Bostic, Carlos Martir, Esq. was assigned to represent Levan. Mr. Bostic and Mr. Martir were both staff attorneys of the Federal Defender's office. Levan expressed a concern that Mr. Martir did not have adequate time to prepare the case for retrial. We held a hearing on August 11, 1997. Levan expressly decided to have Mr. Martir, rather than Mr. Bostic, or another lawyer, represent him at trial. Transcript of Hearing dated August 11, 1997. We also rescheduled the trial for September 15, 1997. *Id.* This trial eventually resulted in Levan's conviction. Levan, then represented by David McColgin, Esq. of the Federal Defender's Office, filed a timely appeal. The Court of Appeals affirmed the conviction and sentence on January 27, 1999.

1. Levan does not contend that his representation at this trial was ineffective.

Levan, now represented by Paul Yatron, Esq., filed the instant motion on April 25, 2000, seeking a new trial, or, in the alternative, the vacation of his sentence and a re-sentencing pursuant to applicable law. This motion was supplemented on July 28, 2000, following the Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[2] On July 27, 2000, the government filed a response to the initial motion. Then, on September 11, 2000, the government filed a response to the supplement. We granted Petitioner's request for a hearing which was held on November 14, 2000. On November 21, 2000, the government submitted a letter discussing the retroactive application of *Apprendi*. On December 15, 2000, at this Court's request, Petitioner submitted a supplemental brief to which the government responded on January 2, 2001.

In his initial motion, Petitioner makes two arguments. First, he contends that his trial counsel was ineffective both during trial and at sentencing. Second, he contends that the government failed to turn over *Brady* material which prejudiced him. Levan, through counsel, then filed supplementary materials arguing that *Apprendi* applied here and that he was denied due process and trial by jury because the Court and not the jury determined the quantity of drugs involved.

**II. DISCUSSION**

A. *Apprendi* applies to Drug Quantity Determinations [3]

Under the narcotics laws in effect at the time of Levan's trial, he faced a maximum sentence of twenty years for conspiring to manufacture any amount of methamphetamine. 21 U.S.C. § 841(b)(1)(C). The maximum sentence increased to forty years if a finding was made that the offense involved 100 grams or more of a mixture or substance containing methamphetamine. 21 U.S.C. § 841(b)(1)(B). At sentencing, this Court found that Levan's offense involved over 3,600 grams of methamphetamine. Consequently, we sentenced him under 21 U.S.C. § 841(b)(1)(B) to 293 months. Levan, relying on *Apprendi*, argues that his Constitutional rights were violated, since the finding of the drug quantity by the Court resulted in a sentence greater than the 240 months statutory maximum for an unspecified amount of methamphetamine. Pet. Supp. Motion (7/28/00) at ¶¶ 5–7; Pet. Supp. Br. (12/15/00) at 9–12.

In *Apprendi*, the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon finding, by a preponderance of

---

**2.** The government argued that this supplement constituted a successive petition. Response to Supp. Pet. (9/11/00) at 5. We disagree. Under Fed.R.Civ.P. 15(a), which governs habeas corpus petitions, parties have a right to amend their pleadings once, at any time before the responsive pleading is served. Petitioner's self-styled "Supplemental Motion" was filed one day after the government served its response. Accordingly, Petitioner's Amendment requires our permission. *Id.* Leave to amend is to be "freely given when justice so requires." *Id.* The Supreme Court announced its decision in *Apprendi* while this motion was pending. One of the claims in the initial motion was that counsel was ineffective for failing to object to the drug quantity determination. Pet. Br. at 9–12. The papers filed on July 28, 2000, merely point out the applicability of the new case to this point. District court's

have the authority to permit an amendment to clarify a claim initially made, even if the filing of the amendment occurs after the one year deadline established under by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2255. *See United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999). Accordingly, we will consider whether the new rule announced in *Apprendi* applies here. Moreover, even if we wrongly considered the *Apprendi* claim, there is no harm as we are denying the claim.

**3.** The government does not contest the applicability of *Apprendi* to drug quantity determinations that trigger higher maximum penalties under the various subsections of 21 U.S.C. § 841. Response to Supp. Pet. (9/11/00) at 9.

the evidence, that the defendant: "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." 120 S.Ct. at 2351 (quoting N.J.S.A. § 2C:44–3(e)). The Supreme Court reversed, holding that: "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2363–64. Despite the factual distinctions between determining motivating factors and quantities of narcotics, the Court's holding in ·*Apprendi* is broadly worded to cover *any* fact, other than a prior conviction, which increases the statutory maximum.[4] *Id.*

The Third Circuit has yet to declare that *Apprendi* applies to drug quantity cases generally, or to the specific determination of the amount of methamphetamine. However, in *United States v. Mack*, 229 F.3d 226 (3d Cir.2000), Chief Judge Becker discussed, in dicta, a Ninth Circuit case applying *Apprendi* to drug quantity determinations. *Id.* at 241 n. 6 (Becker, J. concurring)(discussing *United States v. Nordby*, 225 F.3d 1053, 1056 (9th Cir. 2000)). *Nordby* held that the amount of drugs for which a defendant is sentenced under 21 U.S.C. § 841(b)(1) is a fact that: "increases the prescribed statutory maximum penalty to which a criminal defendant is exposed." 225 F.3d at 1056. In *Nordby*, the defendant was convicted of manufacturing marijuana and possession of marijuana with an intent to distribute it under § 841(a). *Id.* The district court instructed the jury that the government was not required to prove the amount or quantity of marijuana manufactured as long as the government proved beyond a reasonable doubt that the defendant manufactured a measurable or detectable amount of marijuana. *Id.* The defendant was convicted by the jury and sentenced to life

imprisonment by the court. *Id.* The Ninth Circuit held that the defendant's sentence could only be based on facts found by the jury. *Id.* Since the jury did not make a quantity finding, the defendant's life sentence exceeded the prescribed statutory maximum. *Id. See also United States v. Doggett*, 230 F.3d 160 (5th Cir.2000)(applying *Apprendi* to drug quantity challenge on direct appeal); *United States v. Aguayo–Delgado*, 220 F.3d 926 (8th Cir. 2000); *United States v. Gibbs*, 125 F.Supp.2d 700 (E.D.Pa.2000).

█ While *Apprendi* applies to any factual determination used to justify the application of a higher statutory maximum penalty, it does not apply to a district court's determination of sentencing guideline issues or factual determinations made under the guidelines that increase a sentence within the applicable statutory maximum. In *Doggett*, the Fifth Circuit explained that drug quantity for any sentence beyond a statutory maximum penalty was an element of the offense which must be established beyond a reasonable doubt while the drug quantity determination for all other purposes remained an issue for the sentencing court under the preponderance of the evidence standard. 230 F.3d at 163–164. *Accord United States v. Angle*, 230 F.3d 113 (4th Cir. 2000); *Hernandez v. United States*, 226 F.3d 839, 841 (7th Cir.2000); *Aguayo–Delgado*, 220 F.3d at 933. The Court in *Doggett* based its conclusion, in part, upon a determination that *Apprendi* did nothing to overrule the Court's prior holding in *Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998), that the sentencing judge properly determines drug quantity and relevant conduct when imposing a sentence within the relevant range. 230 F.3d at 166.

Levan's sentence of 293 months exceeded the statutory maximum set for an unspecified amount of methamphetamine.

4. Justice Thomas, in his concurrence, argued for an even broader rule covering prior con-

victions. 120 S.Ct. at 2368–2369.

*See* 21 U.S.C. § 841(b)(1)(C). Accordingly, the *Apprendi* rule encompasses these facts and we turn to whether the decision applies retroactively to cases on collateral review.[5]

### B. *Apprendi* Should Not Apply to Cases on Collateral Review

■ Collateral challenges are not reviewed as favorably as direct appeals. *See United States v. Frady,* 456 U.S. 152, 164–165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). An error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. *Id.* In addition to this less favorable review standard, petitioners seeking relief under 28 U.S.C. § 2255 do not always receive the benefit of new rules decided after their convictions become final. Out of respect for the doctrine of finality, new procedural rules are generally not applied retroactively. *Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This Circuit adheres to the approach set forth in *Teague* to evaluate when to apply a new rule to a habeas petition. *West v. Vaughn,* 204 F.3d 53, 61 (3d Cir.2000).

■ The Third Circuit has not yet decided the issue of whether *Apprendi* may be applied retroactively to habeas corpus petitions. Several other Circuits have held that *Apprendi* may not be applied retroactively to successive habeas corpus petitions because the Supreme Court has not specifically declared that the decision to be retroactive. *Hernandez,* 226 F.3d at 840; *Talbott v. Indiana,* 226 F.3d 866, 868–70 (7th Cir.2000); *Rodgers v. United States,* 229 F.3d 704, 706 (8th Cir.2000)(per curiam); *In Re Joshua,* 224 F.3d 1281, 1282

(11th Cir.2000); *Sustache–Rivera v. United States,* 221 F.3d 8, 15 (1st Cir.2000). These courts have reasoned that the language of the successive petition provision of the AEDPA, 28 U.S.C. § 2255, mandates that the Supreme Court actually hold a new rule retroactive before it can be applied retroactively by lower courts. *See id.*

The parties have not cited, nor have we found, any authority extending the holdings of these decisions to initial habeas corpus petitions. However, at least one circuit has refused to apply *Apprendi* to an initial habeas corpus petition. *Jones v. Smith,* 231 F.3d 1227 (9th Cir.2000). In *Jones,* the Court applied the *Teague* test to an initial 28 U.S.C. § 2254 petition and concluded that the new rules announced in *Apprendi* did not satisfy the requirements for retroactivity.[6] *Id.* at 1237–1238. Several district courts have also determined that *Apprendi* does not apply to initial habeas corpus petitions. *Gibbs,* 125 F.Supp.2d at 702–03; *United States v. Pittman,* 120 F.Supp.2d 1263 (D.Or.2000)(refusing to apply *Apprendi* to a case in which a prisoner attacked a sentence based on the fact that the judge determined the weight of the drugs by a preponderance of the evidence); *United States v. Johnson,* 126 F.Supp.2d 1222, 1225 (D.Neb.2000); *Ware v. United States,* 124 F.Supp.2d 590, 593 (M.D.Tenn.2000); *United States v. Brown,* No. 3:97–CV–913–P, 2000 WL 1880280, *1 (N.D.Tex. Dec.28, 2000)(denying leave to amend a § 2555 motion because *Apprendi* claim was not cognizable on collateral review); *West v. United States,* 123 F.Supp.2d 845 (D.Md. 2000).[7] *See also United States v. Joseph,*

---

**5.** Retroactivity is a threshold matter which must be examined before coming to the merits of a case. *Teague v. Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**6.** In *Jones,* the petitioner challenged his attempted murder conviction on the grounds that the Government had omitted a premeditation charge from a state court murder information but had included such a charge in the jury instructions, thereby amounting to a vari-

ance in or amendment to the information. *Id.* at 1230. While this is not exactly on point in regard to how *Apprendi* applies to an omission of drug weight from an indictment, the logic of *Jones* is applicable to Levan's claims. *See Ware v. United States,* 124 F.Supp.2d 590, 596–97 (M.D.Tenn.2000).

**7.** A Minnesota district court reached the opposite conclusion, finding that *"Apprendi* is so grounded in fundamental fairness that it may

No.Crim. A. 96–275, 2000 WL 1789989, *2 (E.D.La. Dec.5, 2000)(refusing to apply *Apprendi* retroactively but noting that the sentence was not above the statutory maximum); *Klein v. United States*, 125 F.Supp.2d 460, 466 (D.Wyo.2000)(same).

■ We cannot rely on the Supreme Court's failure to call for retroactive application of *Apprendi* as a basis for refusing to apply the rule here. *See West*, 204 F.3d at 61. Under the Third Circuit's approach: "federal courts may retroactively apply new rules of law on habeas petitions if the rules are watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, that alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Id.* at 59–60 (internal quotations and citations omitted). This test is identical to that set forth in *Teague*. *See* 489 U.S. at 303, 109 S.Ct. 1060. It consists of a three-stage inquiry. *Id.* The first question is whether the conviction became final before the new decision. *Id.* It is undisputed that Mr. Levan's conviction became final in 1999, well before *Apprendi* was decided.

The second inquiry is whether the decision adopts a new rule of criminal procedure. *Apprendi* constitutes a procedural rule because it dictates what fact-finding procedure must be employed to ensure a fair trial. *Teague*, 489 U.S. at 312, 109 S.Ct. 1060; *Apprendi*, 120 S.Ct. at 2354 ("the substantive basis for New Jersey's enhancement is ... not at issue; the adequacy of New Jersey's procedure is").[8] *Apprendi* also announces a new rule. A new rule is one that is not dictated by precedent existing at the time the defendant's conviction became final. *Teague*, 489 U.S. at 301, 109 S.Ct. 1060. No prior precedent dictated that any factor that increased the maximum punishment for an offense must be charged in the indictment and found by the jury beyond a reasonable doubt. *United States v. Gibbs*, 190 F.3d 188 (3d Cir.1999). Prior to *Apprendi*, every Circuit Court in the country considered drug quantity penalties under § 841(b) to be sentencing factors for a judge to determine based upon a preponderance standard of proof. *See, e.g., id.; United States v. Lindia*, 82 F.3d 1154, 1160–1161 (1st Cir.1996); *United States v. Deisch*, 20 F.3d 139, 146 (5th Cir.1994). The fact that so many courts have consistently followed a practice contrary to the rule announced in *Apprendi* serves as proof that the rule is new. *See Cain v. Redman*, 947 F.2d 817, 821 (6th Cir.1991); *Bilzerian v. United States*, 127 F.3d 237, 240 (2nd Cir.1997). Thus, we conclude that *Apprendi* satisfies the *Teague* test for evaluating whether a case announces a new rule of criminal procedure. *See Jones*, 231 F.3d at 1236 ("*Apprendi* certainly established a new rule"); *United States v. Rogers*, 228 F.3d 1318 (11th Cir.2000)(explaining why *Apprendi* constitutes a "new" rule); *Pittman*, 120 F.Supp.2d at 1269; *Gibbs*, 125 F.Supp.2d 700; *Ware*, 124 F.Supp.2d at 594.

■ Ordinarily, if the conviction was final before the issuance of the decision adopting the new rule, there is no retroactive application. *Teague*, 489 U.S. at 307,

be considered of watershed importance." *United States v. Murphy*, 109 F.Supp.2d 1059, 1064 (D.Minn.2000). Similarly, a district court in North Carolina also concluded that *Apprendi* applied retroactively, because it amounted to a substantive change in the law. *Darity v. United States*, 124 F.Supp.2d 355 (W.D.N.C.2000). For the reasons set forth below, we disagree with the conclusions of these two courts.

8. A North Carolina district court concluded that *Apprendi* was a substantive decision which concerned the reach of a drug statute. *Darity*, 124 F.Supp.2d at 360–61. Accordingly, it concluded that *Teague's* retroactivity rules did not apply. *Id.* We respectfully disagree and instead rely upon the plain text of the opinion and the fact that the parties before us do not dispute that *Apprendi* announced a new procedural rule. *Apprendi*, 120 S.Ct. at 2354; Pet. Supp. Br. at 9; Gov. Supp. Br. at 2.

109 S.Ct. 1060. New rules are applied retroactively only in two limited instances. The first exception covers situations where the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law." *Teague*, 489 U.S. at 311, 109 S.Ct. 1060. Petitioner concedes that this exception does not apply here. Pet. Supp. Br. at 9. The second exception to the non-retroactivity rule applies when the rule implicates fundamental fairness in a way that seriously affects the likelihood of an accurate conviction. *Id.* at 312–313, 109 S.Ct. 1060. For the reasons set forth below, we find that *Apprendi* does not fit this exception either.

While the "precise contours" of the second *Teague* exception are "difficult to discern," the Supreme Court has limited the class of new rules to those which constitute: "watershed rules of criminal procedure implicating fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). A rule that qualifies under this exception must: "not only improve accuracy but also alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

In *Teague*, Justice O'Connor stated that it is unlikely that there could be many such rules. 489 U.S. at 313, 109 S.Ct. 1060. In *United States v. Mandanici*, 205 F.3d 519 (2nd Cir.2000), the Second Circuit noted that the Supreme Court has repeatedly, "underscored the narrowness of the second *Teague* exception." *Id.* at 528. The Second Circuit examined eleven new rules announced by the Supreme Court and analyzed under the *Teague* framework and noted that in all eleven cases, the Court held that the rule at issue should not be applied retroactively. *Id.* at 529. New rules held not to constitute watershed developments include: a defendant's right not to have a jury consider certain invalid aggravating circumstances, *Lambrix v. Singletary*, 520 U.S. 518, 539–540, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997), a defendant's right to inform a sentencing jury that he is ineligible for parole under certain circumstances, *O'Dell v. Netherland*, 521 U.S. 151, 167, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), and the failure to instruct a jury that it could not convict a defendant if it found a mitigating mental state. *Gilmore v. Taylor*, 508 U.S. 333, 345–46, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). Several courts have also refused to retroactively apply *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), which held that in a prosecution for false statements under federal law, the jury and not the court, must decide materiality. *See, e.g., Bilzerian*, 127 F.3d at 241; *United States v. Shunk*, 113 F.3d 31, 36 (5th Cir.1997); *United States v. Swindall*, 107 F.3d 831, 836 (11th Cir.1997).[9]

The Supreme Court has emphasized that: "the choice between retroactivity and non-retroactivity in no way turns on the value of the constitutional guarantee involved." *Johnson v. New Jersey*, 384 U.S. 719, 728, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). While, the right to a jury determination of guilt beyond a reasonable doubt is an important constitutional protection, the importance of this new safeguard must be evaluated against a backdrop of the

---

**9.** *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), has repeatedly been pointed to as an example of a rule which fits the *Teague* exception. *See e.g., Saffle*, 494 U.S. at 495, 110 S.Ct. 1257. In *Gideon*, the Court held that "a defendant has the right to be represented by counsel in all criminal trials." 372 U.S. at 344, 83 S.Ct. 792. On occasion, some Circuit Courts have also applied the second *Teague* exception.

Several courts retroactively applied the rule announced in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). *Sullivan* held that a jury instruction relieving the state of the burden of proving an offense beyond a reasonable doubt can never be harmless. *See e.g., West v. Vaughn*, 204 F.3d 53 (3d Cir.2000); *Adams v. Aiken*, 41 F.3d 175, 178–79 (4th Cir.1994).

protections which the defendant did in fact receive. *Solem v. Stumes*, 465 U.S. 638, 644, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). The Supreme Court has repeatedly declined to apply new constitutional standards retroactively to prior cases if the defendants in those cases had the benefit of preexisting, albeit less specific or less stringent, standards protecting the same interests. *See, e.g., id.* A rule which fits the second *Teague* exception must be aimed at correcting a structural error so severe that the integrity of the guilty verdict is questioned. *West*, 204 F.3d at 61; *Gibbs*, 125 F.Supp.2d 700.

We find that the two new rules announced in *Apprendi* that: (1) a jury, rather than a judge must determine facts supporting a statutory sentencing enhancement, and (2) that this determination must be made beyond a reasonable doubt—are not the type of watershed rules implicating fundamental fairness that necessitate retroactive application on collateral review.[10] Shifting an element of the offense from jury to judge and utilizing a preponderance rather than a beyond a reasonable doubt standard does not implicate fundamental fairness or relate to the accuracy of the conviction or sentence. *See Jones*, 231 F.3d at 1237–1238; *Pittman*, 120 F.Supp.2d at 1269. *See also Bilzerian*, 127 F.3d at 240.[11] The fact that the application of a different standard of review might lead to different results is insufficient. *Mackey v. United States*, 401 U.S. 667, 672, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971). In *Mackey*, the Supreme Court expressly rejected a claim that the mere probability that a different result

would be reached by application of a new rule was sufficient to trigger retroactive application. 401 U.S. at 672, 91 S.Ct. 1160. The *Apprendi* rule is neither implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial. *See Jones*, 231 F.3d at 1238.

Although not controlling, we also note that courts which have considered the application of *Apprendi* on direct review have applied harmless error analysis. *See, e.g., United States v. Garcia–Guizar*, 234 F.3d 483, 488 (9th Cir.2000)("*Apprendi* error was harmless beyond a reasonable doubt"); *United States v. Sheppard*, 219 F.3d 766, 768–69 (8th Cir.2000); *United States v. Nance*, 236 F.3d 820, 824–25 (7th Cir.2000); *United States v. Page*, 232 F.3d 536 (6th Cir.2000); *United States v. Nealy*, 232 F.3d 825 (11th Cir.2000). The standard for invoking structural error on direct review is similar to the *Teague* test; that is the error must implicate the fundamental fairness and accuracy of a criminal proceeding. *See Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Thus, the reasoning of these courts supports our decision not to retroactively apply *Apprendi*. *See Pittman*, 120 F.Supp.2d at 1270, *Gibbs*, 125 F.Supp.2d at 705.

The evidence which dictated this Court's drug quantity determination was presented without dispute to the jury at trial. There is no reason to believe that the jury would have found a different quantity than we did, much less a quantity beneath the 100 gram threshold.[12] The lack of a jury

---

**10.** In *Teague* the Court expressed concern for the finality of judgments. Applying *Apprendi* retroactively could lead to overwhelming and potentially disastrous results. For over ten years, every court, in every jurisdiction, has treated drug quantity as a sentencing factor for the judge to determine. Requiring the application of *Apprendi* to every federal and state sentence imposed under a bifurcated fact finding system would necessitate a review of thousands of cases when actual innocence of the defendant of the charge and sentence is

not in doubt. *See Pittman*, 120 F.Supp.2d at 1270.

**11.** In *Bilzerian*, the Second Circuit refused to apply the *Gaudin* rule retroactively. 127 F.3d at 241. The Court held that shifting a determination from the judge to the jury did not "alter our understanding of the bedrock procedural elements essential to the fairness of a trial." 127 F.3d at 241.

**12.** As discussed above, under the narcotics law in place at the time of the trial, twenty

finding as to the single element of drug quantity and the lack of such a finding made beyond a reasonable doubt does not call into question the validity of the verdict. *See Gibbs,* 125 F.Supp.2d at 705–06, relying on *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In *Neder,* the judge, rather than the jury made a finding that the evidence established materiality. 527 U.S. at 9, 119 S.Ct. 1827. The Supreme Court acknowledged that the jury had not rendered a complete verdict because it did not make a finding of materiality. 527 U.S. at 11, 119 S.Ct. 1827. Nonetheless, the Court applied harmless error analysis because the mistake "did not vitiate all of the jury's findings." *Id. Neder* is instructive here because in the instant case a fact issue due to be resolved by the jury using a reasonable doubt standard instead went to the judge who used a less exacting standard. Since this error is limited to a single element, we have a basis on which to imagine what a fully instructed jury would have done. *See Neder,* 527 U.S. at 16, 119 S.Ct. 1827; *United States v. Swatzie,* 228 F.3d 1278, 1283 (11th Cir.2000).

The evidence presented against Levan was significant and there is simply no basis for concluding that the "likelihood of an accurate conviction" will be "seriously diminished" by not applying *Apprendi* retroactively. *See Gibbs,* 125 F.Supp.2d at 705, quoting *Teague,* 489 U.S. at 313, 109 S.Ct. 1060. Accordingly, we will not overturn Levan's sentence for conspiracy to distribute methamphetamine.

### C. Ineffective Assistance of Counsel

■ To obtain relief for ineffective assistance of counsel, Petitioner must show

that: (1) his counsel's conduct was deficient and "fell outside the wide range of professionally competent assistance," and (2) that he was prejudiced as a result of that deficient conduct. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. DeRewal,* 10 F.3d 100, 104 (3d Cir. 1993).[13] Under *Strickland,* the proper measure for evaluating counsel's performance is: "reasonableness under prevailing norms." *Id.* at 688, 104 S.Ct. 2052. Petitioner must overcome the presumption that his lawyer's actions constituted sound trial strategy. *Id.* at 689–690, 104 S.Ct. 2052. Ineffective counsel claims also need to satisfy a "but for" test. Under this test, there must be a reasonable probability that "but for" counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 695, 104 S.Ct. 2052; *Frey v. Fulcomer,* 974 F.2d 348, 358 (3d Cir.1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

1. Alleged Failures to Identify or Call Certain Potential Witnesses

■ Levan claims that his counsel was ineffective because he failed to interview and call certain potential witnesses. Pet. Br. at 5; Pet. Supp. Br. at 2–4. Mr. Martir did not interview three witnesses who testified on Petitioner's behalf at the first trial: Leininger, Ditzler and Ruffner. *Id.* Two of these witnesses, Leininger and Ditzler, did not testify at the retrial. *Id.* Levan concedes that Mr. Martir was aware of the substance of the testimony given by these witnesses. *Id.* However, he contends that the failure to interview these witnesses personally amounted to ineffective assistance. *Id.* Levan also contends that his counsel never interviewed the fol-

---

years was the maximum sentence for any amount of methamphetamine while forty years was the maximum sentence for any amount above 100 grams. 21 U.S.C. § 841(b)(1)(B)-(C).

13. Ineffective assistance of counsel claims can be raised for the first time in a 28 U.S.C. § 2255 petition without the need to satisfy the

test laid out in *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). *See DeRewal,* 10 F.3d at 103; *United States v. Rieger,* 942 F.2d 230, 235–236 (3d Cir.1991)(expressing a preference for ineffective assistance of counsel claims to be brought on collateral attack); *United States v. Nahodil,* 36 F.3d 323, 326 (3d Cir.1994).

lowing people: Landis, Plank, Kohler, and Ciccone. *Id.* at 6. He argues that these four individuals could have provided favorable testimony. *Id.*

■ Petitioner has the burden of overcoming the presumption that the challenged action may be considered trial strategy. *Strickland,* 466 U.S. at 688–689, 104 S.Ct. 2052; *Gov't of the Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1431 (3d Cir.1996). Determining which witnesses to call at trial is intrinsically strategic and therefore left to the discretion of counsel. *See* ABA Standards of Criminal Justice, Standard 4–5.2; *Diggs v. Owens,* 833 F.2d 439, 446 (3d Cir.1987); *United States v. Merlino,* 2 F.Supp.2d 647, 662 (E.D.Pa. 1997). Generally, the "expertise [of counsel] leads them to choose only those witnesses likely to assist the case." *United States v. Ciancaglini,* 945 F.Supp. 813, 823 (E.D.Pa.1996). As such, the decision of which witnesses to call, "is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second-guessing." *Id.* (citations omitted). In fact, "[t]he decision to call or bypass particular witnesses is peculiarly a question of trial strategy, which courts will practically never second guess." *United States v. Edwards,* No.Crim. 96–592, 2000 WL 572704, at *4 (E.D.Pa. May 8, 2000) (citations omitted); *Ciancaglini,* 945 F.Supp. at 823; *United States v. Narducci,* No. Civ. 97–2813, 1997 WL 634378, at 11 (E.D.Pa. Sept.30, 1997).

At the hearing on this matter and in his affidavit, Mr. Martir, stated that he reviewed the transcript of all witnesses testifying at the first trial and discussed their testimony with Levan's prior counsel, Edson Bostic. *See* Gov. Ex. 1, Martir Decl. ¶¶ 4–6. Mr. Martir also met with Levan and considered the discovery materials provided by the government. *Id.* Based on these steps and his reasonable professional judgment, Mr. Martir made an informed decision about which witnesses to call at the retrial. *Id.* The witnesses which were not called were not helpful to the

planned defense. *Id.* at ¶¶ 5–6. Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only those witnesses likely to assist the case. *See United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990); *see also United States v. Griffin,* 1993 WL 34927 (E.D.Pa. Feb.9, 1993), *aff'd,* 16 F.3d 406 (1993); *Ciancaglini,* 945 F.Supp. at 823; *Narducci,* 1997 WL 634378, at 11. Mr. Martir's decision to call different witnesses at the retrial does not amount to ineffective assistance.

In regard to Landis, Plank, Kohler and Ciccone, Mr. Martir testified that Levan never told him about these witnesses. We believe and credit Mr. Martir's testimony and hold that he did not render ineffective assistance by failing to interview these individuals. In making decisions about whether to interview a witness, counsel may rely on what his client tells him. *Lewis v. Mazurkiewicz,* 915 F.2d 106, 111 (3d Cir.1990). Depending on the defendant's statements to counsel, the need for further investigation may be considerably diminished or eliminated all together. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Lewis,* 915 F.2d at 113. Moreover, even if these witnesses were known to Mr. Martir, his decision not to interview them is reasonable and within his discretion. Mr. Bostic, whose competence is never questioned by Levan, did not call these witnesses. In addition, as discussed below, Plank could not have provided material helpful to the defense. Defense counsel has no obligation to call, or even interview, a witness whose testimony would not have exculpated a defendant or whose testimony would have been inconsistent with a defense theory. *United States v. Jones,* 785 F.Supp. 1181, 1183 (E.D.Pa.1992), *aff'd,* 980 F.2d 725 (3d Cir.1992).

2. Failure to Exclude Petitioner's Prior Conviction

■ Levan next contends that Mr. Martir was ineffective for not moving to exclude evidence of Levan's prior marijua-

na dealing conviction. Pet. Br. at 7–9; Pet. Supp. Br. at 4–5. In connection with the first trial, Mr. Bostic filed a motion in limine seeking to prevent the use of Movant's conviction in Pennsylvania State Court for possession with intent to deliver marijuana. *Id.* This Court overruled this motion and admitted the evidence. *Id.* At the retrial, Mr. Martir did not make such a motion. There is no reason to believe that the Court would reverse itself and exclude evidence of the conviction at the retrial. Counsel is not ineffective for refusing to argue a moot point.

Levan contends that even if the failure to make the motion was reasonable, his counsel should have preserved the issue for appeal. Pet. Br. at 8. This contention is without merit. Mr. Martir testified that he thought the issue was preserved for purposes of appeal since it was raised in the first trial. Although, the Third Circuit considered the issue waived, Levan was not prejudiced by Mr. Martir's failure to object to allowing the use of the prior conviction. Preserving the issue for appeal would have had the effect of requiring the Court of Appeals to apply a more relaxed standard of review. The Court of Appeals found that this Court did not commit any error in admitting evidence of the prior conviction, "let alone a plain error." *United States v. Levan,* No. 98–1054, 1999 WL 86277 (3d Cir. Jan.27, 1999). Accordingly, even if the Court of Appeals had been required to use a more relaxed standard of review, it would not have made a difference. *Id.*

### 3. Alleged Deficiencies at Sentencing

██ Finally, Levan asserts that his counsel was ineffective at sentencing. Levan contends that since his marijuana-dealing conviction was still on appeal, it was not final for purposes of the mandatory minimum sentencing enhancement set forth in 21 U.S.C. § 841(b)(1)(A). Pet. Br.

at 9–10; Pet. Supp. Br. at 5–7. He also claims that Mr. Martir should have challenged the drug quantity which the Court used to calculate Levan's Guideline range. *Id.*

Levan appears correct that the conviction was not final and so no mandatory minimum should have been applied.[14] *See United States v. Allen,* 566 F.2d 1193, 1195 (3d Cir.1977). However, regardless of whether any mandatory minimum applied, Levan still faced a sentencing range of 235–293 months. PSI at ¶¶ 18–27, 54; Gov. Ex. 3. Levan was sentenced to 293 months, which is at the top of this range. Even if the 240–month mandatory minimum sentence did not apply here, Levan cannot show that he was prejudiced by the erroneous application of a mandatory minimum. The sentence called for under the guidelines and imposed by the Court was more severe than the mandatory minimum.

As to the drug quantity relied upon by the court at sentencing, there was no colorable basis for counsel to challenge the quantity. Failure to object did have the result of not preserving the issue for appeal. However, at sentencing, this Court made clear findings about the quantity involved and any objection would have been overruled. Three witnesses testified at trial with respect to the drug quantity: William Salera, a DEA Task Force Officer who worked in an undercover capacity during the investigation of Levan and Slotcavage, Daniel McEwen, another undercover DEA Task Force Officer, and Charles Cusamano, a forensic chemist who testified about how much methamphetamine could be produced from P2P involved here. The evidence established that Levan and Slotcavage participated in negotiations to buy one gallon of "P2P" a precursor chemical used to manufacture methamphetamine. Mr. Cusamano[15] tes-

---

14. The government does not dispute this. Gov. Br. at 17.

15. The parties stipulated that Mr. Cusamano was an expert in the "synthesis or conversion

tified that by using the conversion process described in methamphetamine recipes seized from a residence accessible to Levan, a gallon of P2P would yield about eight pounds of pure methamphetamine. September 17 Transcript at 4–6. Mr. Cusamano testified that if the manufacturer cleaned out the excess methylamine present in the process, even greater amounts could be produced. *Id.* at 6. Officers Salera and McEwen testified that Slotcavage informed them that he could make eight pounds of methamphetamine "by the book" and up to sixteen pounds if he "stretched" the P2P. September 16 Transcript at 152, 176. Levan agreed with Slotcavage's estimates. *Id.* at 152. In light of the strong evidence corroborating the amount listed in the PSI, any objection as to the quantity would have been overruled.

D. Alleged Failure to Comply with *Brady v. Maryland*

▆▆▆▆▆ The remaining grounds on which Petitioner seeks post-conviction relief were not raised by Mr. Levan in his direct appeal.[16] The government's alleged failure to disclose *Brady* material, may not be raised for the first time in a collateral attack on a sentence without the petitioner showing "cause" for his procedural default and "actual prejudice" resulting from the error. *United States v. Frady,* 456 U.S. 152, 162–167, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *United States v. Essig,* 10 F.3d 968, 979 (3rd Cir.1993); *United States v. Lampkin,* No. Civ. A. 98–CV–5270, 1999 WL 715157 (E.D.Pa. Sept.15, 1999). *See also Langston v. United States,* 105 F.Supp.2d 419, 422 n. 2 (E.D.Pa.2000). Petitioner has not offered any explanation for his failure to raise this issue on direct appeal. We find that he has not satisfied the cause standard, and for the reasons

discussed below, is also unable to show any prejudice resulting from us deciding not to examine *Brady* claims. Moreover, Petitioner has not laid out a claim of actual innocence. Alternatively, we conclude that even if there was no procedural bar to Petitioner raising his *Brady* claims here, these claims would still fail on the merits.

Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, prosecutors have an affirmative duty to disclose evidence that would "tend to exculpate" the defendant or "reduce the penalty to be imposed upon him." *Id.* at 87–88, 83 S.Ct. 1194. In *Brady,* the Supreme Court held that: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has extended *Brady,* holding that the duty to disclose exists even if there has been no request by the accused. *See United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The material covered by this duty includes both impeachment and exculpatory evidence. *See Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

▆▆▆▆ Every failure to disclose favorable evidence does not rise to a constitutional violation. *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555. Rather, such a failure to disclose constitutes a due process violation, "only if the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434, 115 S.Ct.

---

process of methamphetamine." September 17 Transcript at 2–3.

**16.** Neither the government nor the Petitioner discusses the possibility of procedural default of the *Brady* claims. While we are not required to raise the issue of procedural default *sua sponte,* we do have the authority to do so.

*Smith v. Horn,* 120 F.3d 400, 407–09 (3rd Cir.1997), cert. denied, 522 U.S. 1109, 118 S.Ct. 1037, 140 L.Ed.2d 103 (1998) (explaining that the issue of procedural default may be raised *sua sponte* by the court of appeals but exercised discretion not to raise the defense *sua sponte* ).

1555. Thus, the failure to disclose so-called *"Brady* material" rises to the level of a *"Brady* violation" only where: "the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

 "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936. *See also United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991).

Levan contends that his conviction should be overturned because the government violated its duty to disclose evidence favorable to the accused by allegedly failing to provide his counsel with three documents: (1) the written statement of Clair Plank("Plank"); (2) the criminal misdemeanor record of Renee Norman ("Norman"); and (3) the transcript of the grand jury testimony of Special Agent James Farnsworth ("Farnsworth") of the Drug Enforcement Administration.[17]

**1. The Plank Statement**

 On July 2, 1997, Plank provided DEA agents with a one-page written statement regarding her interaction with Levan on May 1, 1997. Gov. Ex. 4. In the statement given to the DEA agents, Plank stated that Levan obtained possession of the truck used in the connection with the crime by asking permission to use it and

that she had seen Levan and Slotcavage together about twenty times. *Id.* She also stated that Levan borrowed her truck at about 1:00 p.m. and returned it between 6:00 p.m. and 7:00 p.m., *Id.* In her affidavit submitted with this case, she states that he picked up the truck at 2:45 p.m. and returned it at 6:00 p.m. Pet. Ex. A. This affidavit also contains less information than her statement to the DEA agents. *Compare* Pet. Ex. A (Plank's Affidavit) *with* Gov. Ex. 4 (statement given to the DEA). In her statement to the agents, she said that Levan smelled like he had been drinking alcohol when he returned the truck and that he put his hand through a glass door while arguing with a couple of drivers after returning the truck. Gov. Ex. 4.

Mr. Kaiser, the attorney for the government, testified that he did not turn over the statement for two reasons. First, he determined that it did not contain any exculpatory information. In fact, he thought it inculpated Levan. Mr. Kaiser reasoned that a person was less likely to want to use their own car when they are planning on engaging in a criminal activity. Second, Mr. Kaiser felt that turning the statement over was unnecessary since neither party intended to call Plank as a witness.[18]

We agree with the government that Plank's statement is not *Brady* material. It does not contain anything exculpatory and it had no impeachment value since Plank was not going to be called as a witness. In his supplemental brief, Petitioner argues that the statement corroborates his movements and that his attorney may have decided to call Plank as a wit-

---

**17.** In discussing each of these alleged violations separately, we do not mean to imply that we did not take the potential cumulative effect of all three alleged violations into account. *See United States v. Gengler,* 574 F.2d 730 (1978)(requiring multiple non-disclosures to be considered separately and jointly). We find that no prejudice has resulted to Mr. Levan even if all three of these items was improperly withheld.

**18.** Mr. Kaiser testified that he did not intend to call Plank, even though he thought her statement inculpated Levan, because her role in the events was minor and any testimony she could give was unnecessary to proving the case against Petitioner.

ness if he had the statement. This argument is not plausible. Plank could not have corroborated the reason for his movements. She could only testify that Levan had borrowed her truck on the afternoon of May 1, 1997. She could offer no explanation as to his whereabouts or activities that afternoon. The type of car used by Levan or how he got to the meetings that afternoon was completely irrelevant to the case. Levan has not shown any prejudice resulting from the government's failure to supply him with the statement, thus, there is no constitutional violation.

### 2. Renee Norman's Criminal Record

Renee Norman, a witness for the government, had two prior convictions. This information was not disclosed to defense counsel. The government argues that it had not obtained Norman's record and that they had no reason to believe that Norman had any prior convictions. Mr. Kaiser testified that Norman did not tell him or any of the agent's working on the case about any prior convictions. He stated that it is his policy to ask personally or have an agent ask about any prior convictions. He was unsure why that did not occur in this instance.

■ We believe that the government did not have any information regarding Norman's prior misdemeanor convictions. Petitioner offered no evidence that the government knew, or had any reason to know of them. However, the government's lack of knowledge is not conclusive. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court found that, for purposes of establishing a *Brady* violation, government officials who did not have actual knowledge of certain information can nevertheless be deemed to have had constructive knowledge of it in some circumstances. *Id.* at 154, 92 S.Ct. 763. A petitioner can prove a *Brady* violation if the government failed to disclose favorable evidence: "actually or constructively in its possession or accessible to it."

**19.** Norman did not testify at the initial trial.

*United States v. Veksler*, 62 F.3d 544, 550 (3d Cir.1995)(quoting *Perdomo*, 929 F.2d at 970). *See also Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir.1998). Non-disclosure is inexcusable where the prosecution has not sought out information readily available to it. *Perdomo*, 929 F.2d at 971.

■ We find that Norman's criminal record was accessible to the prosecution. The government does not contend that it was misled regarding Norman's criminal history or that it lacked the capacity to examine whether she had any prior convictions. *Compare Perdomo*, 929 F.2d at 970 (under certain circumstances requiring the government to do more than conduct a National Crime Information Center database search) *with Hollman*, 158 F.3d at 181 (no *Brady* violation where police clerical error precluded government from turning over complete criminal record). The fact that the convictions occurred in state court and this case was brought by federal prosecutors does not preclude us from imputing knowledge of the criminal record to the government. 929 F.2d at 970 (applying the constructive knowledge rule between state and federal entities); *Johnston v. Love*, 940 F.Supp. 738, 746 (E.D.Pa.1996)(discussing the reality of federal-state cooperation).

■ This does not mean that a *Brady* violation occurred. Petitioner must also show that the material was favorable to him and that he was prejudiced by the government's failure to produce the evidence. *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936. Petitioner cannot satisfy this standard.

The information does not constitute any meaningful impeachment material. Norman was a tangential witness who did not participate in any of the meetings with Levan and Slotcavage regarding the acquisition of P2P.[19] However, to the extent that the information has some relevance to

credibility, we will now examine whether he was prejudiced by not having it.

It is not clear that the misdemeanor convictions would have been admissible for impeachment purposes. Mr. Kaiser testified that had he been aware of the convictions he would have sought their exclusion. Petitioner concedes that Norman's first conviction on September 8, 1993, for violating 35 P.S. § 780–113(a)(16) of the Pennsylvania Controlled Substances Drug Device and Cosmetic Act,[20] is a misdemeanor under both state and federal law. Pet. Supp. Br. at 8. As such, it would not be admissible to attack Norman's credibility under Fed.R.Evid. 609(a)(1). Accordingly, no prejudice could have resulted from the government's failure to make this information known to the Petitioner.

Norman's second conviction on April 28, 1997, for violating the same provision was also a misdemeanor under Pennsylvania law. 35 P.S. § 780–113(b); Pet. Br. Ex. B. Most likely, it would be considered a felony under federal law. Ordinarily, a person convicted under this statute would be subject to a sentence of less than one year. 35 P.S. § 780–113(b). However, if a person was previously convicted of a violation of the same act, the maximum sentence is three years.[21] *Id.* For purposes of this motion, we will assume that Ms. Norman could have been subjected to the three-year maximum sentence.[22] Accordingly,

Petitioner could have used the information for impeachment purposes, since a conviction punishable by a term of imprisonment exceeding one year is generally admissible for this purpose. Fed.R.Evid. 609(a)(1).

Although, Petitioner did not have the benefit of this impeachment material, he was not prejudiced by it. There is no reason to believe that the outcome of the trial would have been different, much less a "reasonable probability" of a different verdict. *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936; *Hollman*, 158 F.3d at 181–183. The evidence of Levan's knowledge of and involvement in the conspiracy was extensive. Three law enforcement witnesses, whose testimony was corroborated by independent evidence, placed Levan directly in the middle of the methamphetamine-manufacturing conspiracy charged in the indictment. Levan actively participated in meetings to obtain P2P, spoke freely and knowledgeably about the methamphetamine manufacturing process, and took concrete steps to further the conspiracy. The record clearly shows that Levan was an active, knowing participant in the methamphetamine conspiracy:[23]

● Levan told three different people that he and Slotcavage had all the glassware necessary to manufacture methamphetamine and were "ready to go." September 16 Transcript at 32, 109, 155, 177–78.

20. The subsection reads as follows: "Knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except as otherwise authorized by this act." 35 P.S. § 780–113(a)(16).

21. Further, if certain specified substances are involved, the violation is considered a felony punishable by a term of imprisonment of up to fifteen years. 35 P.S. § 780–113(n). Neither party submitted any evidence regarding which substance was involved. However, the records submitted by the Petitioner categorize the crime as misdemeanor and show that Ms.

Norman received probation. Based on this, we do not feel that Ms. Norman was convicted of 35 P.S. § 780–113(n). In any event, because we assumed that the conviction was a felony for purposes of this petition the point is moot.

22. In the interests of judicial economy, we will not delve into the intricacies of Pennsylvania law to determine whether Norman qualified for the higher maximum term. Instead, we will give the Petitioner the benefit of the doubt that the conviction would be admissible under the Fed.R.Evid. 609(a)(1).

23. Levan was the only person to testify to the contrary, and this Court has previously held that he committed perjury. *See* Bench Memorandum dated January 9, 1998.

- Levan told Walters that they were going to make a lot of money together. *Id.*

- Levan stood next to Walters while Slotcavage patted him down for a wire and had a discussion with Walters about Slotcavage's failure to check to see if Walters' pager was a secret recording device. *Id.* at 28.

- Levan agreed with "everything that [Slotcavage] was saying" to Salera and McEwen about the manufacture of methamphetamine at the May 1, 1997 American Legion Hall meeting. *Id.* at 152.

- Levan acknowledged that Salera wanted three pounds of methamphetamine "right from the get" in lieu of a $25,000 cash payment. *Id.* at 153, 176–77.

- Levan told Salera and McEwen that he and Slotcavage were "tapped out" and did not have a methamphetamine sample available on May 1, 1997. *Id.* at 153–154

- Levan told Salera and McEwen that it would be about two weeks before he and Slotcavage had their methamphetamine manufacturing operation "up and running." *Id.* at 154.

- Levan told Salera and McEwen that he and Slotcavage expected to obtain a pint of P2P on May 1, 1997. *Id.* at 155, 178.

- Cellular telephone records raised a strong inference that Levan's cellular phone had been used in connection with the methamphetamine conspiracy. September 17 Transcript at 84–92.

- Levan informed a local police officer that he lived with Slotcavage in the house where federal agents recovered the sham P2P, instructions on how to manufacture methamphetamine, a scale and identification documents belonging to Levan. September 17 Transcript at 78–83

None of this evidence in any way relates to Ms. Norman's testimony. Thus, even if the jury completely disregarded her testimony, there was still overwhelming evidence of guilt and there is no reasonable probability of a different outcome. We find that there was no constitutional error in failing to discover and turn over Ms. Norman's prior convictions.

### 3. Farnsworth's Grand Jury Testimony

 Levan claims that the government violated *Brady* by failing to disclose Farnsworth's grand jury testimony.[24] As an initial matter, Mr. Kaiser testified that he provided defense counsel with the transcript. Mr. Martir, Levan's counsel, also recalled having it in his file. We believe and credit the testimony of Mr. Kaiser and Mr. Martir. There is a presumption, well established by "tradition and experience," that prosecutors have fully "discharged their official duties." *United States v. Mezzanatto,* 513 U.S. 196, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). No denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial. *United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984).

Moreover, even if the transcript had not been disclosed, there would not have been a *Brady* violation. The only putative discrepancy identified by Levan is that the testimony before the grand jury and that given at trial differed in the time set for actual delivery of the P2P. Assuming this discrepancy is present, this fact would not exculpate Levan. Levan never disputed

---

**24.** Movant raised this claim in his initial brief. In the Supplemental Brief submitted on December 15, 2000, he no longer asserted that he did not receive the transcript of Farnsworth's Grand Jury Testimony:

> Movant asserts two violations of the rule emanating from the case of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ... The first of these

relates to the failure of the government to turn over a statement made by one Clare Plank ("Plank"). The second relates to the failure to disclose a criminal record of one Renee Norman ("Norman").

Pet. Supp. Br. at 7. Since there was no explicit concession, in the interests of judicial economy, we have chosen to address this alleged *Brady* violation on the merits.

that he was present during meetings with Slotcavage, Walters and the undercover officers. In addition, there is no dispute that the P2P was picked up later in the day by Slotcavage and then recovered at night by law enforcement officers. Thus, the time set for the delivery has no bearing on Levan's guilt or the outcome of the case, so Levan cannot show that he was prejudiced by not receiving the transcript.